**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: ALLSTATE & ARITY CONSUMER PRIVACY LITIGATION | Master Docket No. 1:25-cv-00407<br><br>Hon. Jeremy C. Daniel |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**

# TABLE OF CONTENTS

**Page**


INTRODUCTION ..... 1

BACKGROUND ..... 3

A. The Parties ..... 3

LEGAL STANDARD ..... 4

ARGUMENT ..... 5

I. The Complaint Should Be Dismissed in Its Entirety Under Rules 8 and 9(b) Because the Allegations are Too Vague and Conjectural to Provide Sufficient Notice. ..... 5

A. Each Plaintiff's failure to allege that his or her data *actually* was collected and disclosed warrants dismissal. ..... 5

B. Plaintiffs' shotgun pleading of alleged harms that may have been suffered by some class members are insufficient to support *their* allegations. ..... 7

II. The Complaint Should Be Dismissed Because Plaintiffs Do Not and Cannot Allege That They Did Not Consent to Data Collection. ..... 8

A. The Complaint Fails to Plausibly Allege Plaintiffs Did Not Consent to Defendants' Conduct. ..... 9

B. Plaintiffs' Allegations Regarding Their Review of App Disclosures Negate Any Conclusory Allegation of a Lack of Consent. ..... 10

C. The Actual Terms and Conditions of the Apps at Issue Affirmatively Negate Any Conclusory Allegation of a Lack of Consent. ..... 12

1. The Terms of Service and Privacy Policies Disclosed *What* Data Will Be Collected, *Why* It will be Collected, and *How* It Will be Shared. ..... 13

2. Every App Required Users to Consent to Terms of Service and Privacy Policies Before Accessing and Using the Underlying Service. ..... 16

III. Plaintiffs' Claims Based on Alleged Harm from Insurance Costs and Outcomes Should be Dismissed. ..... 18

A. The "excessive insurance costs" Argument Cannot Be Made on "Information and Belief" Because Plaintiffs Possess the Relevant Information. .......... 18

B. The Filed-Rate Doctrine Precludes Plaintiffs from Asserting Private Legal Claims on the Basis of Excess Insurance Rates. .......... 20

IV. Plaintiffs' State Law Claims Are Preempted by the FCRA. .......... 22

V. Plaintiffs' Federal and State Wiretapping Act Claims Should Be Dismissed. .......... 25

A. Plaintiffs' Federal Wiretap Act Claim (Count I) .......... 25

1. The "Party Exception" Requires Dismissal Because Defendants Are a Party and Plaintiffs Consented to the Alleged Disclosure. .......... 25

2. Alternatively, the FWA Count Must Be Dismissed Because Plaintiff Fails to Plead the Elements of the FWA. .......... 27

B. Plaintiffs' Claims Under Analogous State Wiretapping Statutes Should Be Dismissed for the Same Reasons as the FWA Claim (Counts 11, 14, 19, 34). .......... 30

C. Plaintiffs' California's Pen Register Claim Should Be Dismissed (Count 12). .......... 32

VI. Plaintiffs' Remaining Counts Should be Dismissed for Failure to State a Claim. .......... 32

A. Plaintiffs' Computer Hacking Claims Should be Dismissed (Counts 2, 9, 32). .......... 32

1. Plaintiffs Fail to Allege Defendants Intentionally Accessed Their Device or Computer Without Authorization. .......... 32

2. Plaintiffs Fail to Allege Harm Under the CFAA and CDAFA. .......... 34

B. Plaintiffs Fail to State a Claim Under the FCRA (Count 3). .......... 35

1. Plaintiffs Fail to Identify Any Inaccuracy in their Files. .......... 36

2. Plaintiffs Fail to Allege Harm Caused by What Defendants Reported. .......... 38

3. Plaintiffs Fail to Plead Actual Damages Under the FCRA. .......... 38

C. Plaintiffs' Statutory State Consumer Protection Claims Must be Dismissed. .......... 39

1. Under Six Separate State Statutes, Plaintiffs Fail to Adequately Allege They Complied with the Mandated Pre-Suit Requirements. .......... 39

2. Plaintiffs Fail to Allege Actual Harms Sufficient to State Claims Under Fifteen of the State UDAP Statutes Asserted. ............................... 41

3. All of the State Consumer Protection Statute Claims Sound in Fraud and Must be Dismissed for Failure to Satisfy Rule 9(b).......................... 43

D. Plaintiffs' Remaining Privacy Tort Claims or Counts Based on Inapplicable Statutes Should Be Dismissed (Counts 4–6, 10, 17, 31). .................................... 45

1. Plaintiffs Cannot State a Claims for Invasion of Privacy or Intrusion on Seclusion Under Any Source of Law (Counts 4-6, 31). ...................... 45

2. There Is No Private Right of Action Under the SHIELD Act. ................. 47

3. Plaintiffs' Claims Under OCGA § 13–6–11 Must be Dismissed. ............ 48

VII. Plaintiffs' Claims against AllCorp, AIC, AVPIC, Arity 875 and Arity Services Should Be Dismissed. ........................................................................................ 48

CONCLUSION ........................................................................................................... 50

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abu v. Dickson*,
107 F.4th 508 (6th Cir. 2024) ....................33

*Allison v. ChexSystems Collection Agency, Inc.*,
No. 23-cv-1132, 2023 WL 3200254 (N.D. Ill. May 2, 2023)....................37

*Andrews v. Sirius XM Radio Inc.*,
932 F.3d 1253 (9th Cir. 2019) ....................33, 34

*In re Application for Pen Register & Trap/Trace Device with Cell Site Location Auth.*,
396 F. Supp. 2d 747 (S.D. Tex. 2005) ....................27

*Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth*,
99 F. 4th 928 (7th Cir. 2024) ....................8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................4

*B.K. v. Eisenhower Med. Ctr.*,
721 F. Supp. 3d 1056 (C.D. Cal. Feb. 29, 2024) ....................5, 6

*Barnett v. Mercy Health Partners-Lourdes, Inc.*,
233 S.W.3d 723 (Ky. Ct. App. 2007) ....................41

*Baron v. Pfizer*,
840 N.Y.S.2d 445 (N.Y. App. Div. 2007) ....................43

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................4, 5, 9, 37

*Benson v. Trans Union, LLC*,
387 F. Supp. 2d 834 (N.D. Ill. 2005) ....................35

*Bilek v. Fed. Ins. Co.*,
8 F.4th 581 (7th Cir. 2021) ....................4

*Bonny v. Soc'y of Lloyd's*,
3 F.3d 156 (7th Cir. 1993) ....................11

*Borsellino v. Goldman Sachs Grp., Inc.*,
477 F.3d 502 (7th Cir. 2007) ....................8

*Boudreau v. Lussier*,
901 F.3d 65 (1st Cir. 2018)....................30

*Brodsky v. Apple, Inc.*,
445 F. Supp. 3d 110 (N.D. Cal. Apr. 7, 2020) ....................................................30, 33

*Brown Jordan Int'l, Inc. v. Carmicle*,
846 F.3d 1167 (11th Cir. 2017) ....................................................................................34

*Brown v. Madison Reed, Inc.*,
No. 21-cv-01233, 2021 WL 3861457 (N.D. Cal. Aug. 30, 2021) ..................................17, 29

*Camasta v. Jos. A. Bank Clothiers, Inc.*,
761 F.3d 732 (7th Cir. 2014) ........................................................................................41

*Campbell v. Facebook Inc.*,
77 F. Supp. 3d 836 (N.D. Cal. 2014) .............................................................................42

*In re Carrier IQ, Inc.*,
78 F. Supp. 3d 1051 (N.D. Cal. 2015) ...........................................................................29

*Castagna v. Newmar Corp.*,
No. 3:15-cv-249-TLS, 2016 WL 3413770 (N.D. Ind. June 22, 2016) ................................40

*Chaitoff v. Experian Info. Sols., Inc.*,
79 F. 4th 800 (7th Cir. 2023) .......................................................................................36

*Commw. ex rel. Chandler v. Anthem Ins. Cos., Inc.*,
8 S.W.3d 48 (Ky. Ct. App. 1999) ...............................................................................21, 22

*Charger Servs., LLC v. Togs USA, Inc.*,
No. MO:19-cv-00058-DC, 2019 WL 11519056 (W.D. Tex. Apr. 10, 2019)..........................40

*Chuluunbat v. Experian Info. Sols., Inc.*,
4 F.4th 562 (7th Cir. 2021) ..........................................................................................36

*Cline v. Reetz*-Laiolo,
329 F. Supp. 3d 1000 (N.D. Cal. 2018) .........................................................................31

*Ex parte Cincinnati Ins. Co.*,
51 So. 3d 298 (Ala. 2010)...........................................................................................21

*Coinja West v. Global Lending Servs., LLC*,
No. 24-cv-726, 2025 WL 1534967 (E.D. Pa. May 28, 2025)...............................................45

*Cole v. Quest Diagnostics, Inc.*,
No. 2:23-cv-20647-WJM, 2025 WL 88703 (D.N.J. Jan. 14, 2025) .......................................31

*Commonwealth v. Derr*,
293 A.3d 671 (Pa. Super. Ct. 2023)...........................................................................33, 34

*Cousin v. Sharp Healthcare*,
681 F. Supp. 3d 1117 (S.D. Cal. July 12, 2023) ....................5, 7, 46

*Crabill v. Trans Union, L.L.C.*,
259 F.3d 662 (7th Cir. 2001) ....................38

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)....................25

*Crowley v. CyberSource Corp.*,
166 F.2d 1263 (N.D. Cal 2001) ....................30

*Dante Valve Co. v. Republic Brass Sales, Inc.*,
No. 17-cv-2582, 2019 WL 1406583 (S.D. Cal. Mar. 28, 2019) ....................19

*Dantzler, Inc. v. Hubert Moore Lumber Co.*,
No. 7:13-cv-56, 2013 WL 5372750 (M.D. Ga. Sept. 24, 2013) ....................48

*Davis v. Anderson*,
718 F. App'x 420 (7th Cir. 2017) ....................8

*Deschepper v. Midwest Wine & Spirits, Inc.*,
84 F. Supp. 3d 767 (N.D. Ill. 2015) ....................7

*Diamond Power Int'l, Inc. v. Davidson*,
540 F. Supp. 2d 1322 (N.D. Ga. 2007) ....................33

*Doe 1 v. Chestnut Health Sys., Inc.*,
No. 1:24-cv-01475-JEH-RLH, 2025 WL 1616635 (C.D. Ill. June 6, 2025) ....................27

*Doe v. Amgen Inc.*,
No. 2:23-cv-07448, 2024 WL 575248 (C.D. Cal. Jan. 29, 2024)....................46

*Doe v. Franco Prods.*,
No. 99-cv-7885, 2000 WL 816779 (N.D. Ill. June 22, 2000)....................19

*Dorestin v. Hollywood Imports, Inc.*,
45 So. 3d 819 (Fla. Dist. Ct. App. 2010) ....................41

*Edge v. State Farm Mut. Auto. Ins. Co.*,
623 S.E.2d 387 (S.C. 2005) ....................21

*In re Facebook Privacy Litig.*,
572 F. App'x 494 (9th Cir. 2014) ....................42

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ....................31

*Factory Mut. Ins. Co. v. Bobst Grp., Inc.*,
No. 02-cv-283, 2002 WL 1263991 (N.D. Ill. June 5, 2002)....................................................10

*Fitzgerald v. Trans Union, LLC*,
No. 17-cv-3842, 2018 WL 334530 (E.D. Pa. Jan. 8, 2018)....................................................23

*Fonseca v. Allstate Vehicle & Prop. Ins. Co.*,
No. 7:20-cv-00358, 2020 WL 7497018 (S.D. Tex. Dec. 21, 2020) .......................................44

*Freightliner Corp. v. Myrick*,
514 U.S. 280 (1995)...............................................................................................................22

*Friedlander v. HMS-PEP Prods., Inc.*,
485 S.E.2d 240 (Ga. Ct. App. 1997).......................................................................................44

*Fteja v. Facebook, Inc.*,
841 F.Supp.2d 829 (S.D.N.Y.2012).........................................................................................10

*George v. Transunion Corp.*,
No. 22-cv-4967, 2023 WL 5044956 (E.D. Pa. Aug. 8, 2023) .................................................23

*Gerboc v. ContextLogic, Inc.*,
867 F.3d 675 (6th Cir. 2017) ............................................................................................40, 41

*Gilday v. Dubois*,
124 F.3d 277 (1st Cir. 1997)....................................................................................................29

*Goldstein v. Costco Wholesale Corp.*,
559 F. Supp. 3d 1318 (S.D. Fla. 2021) ....................................................................................31

*Goldwasser v. Ameritech Corp.*,
222 F.3d 390 (7th Cir. 2000) ...................................................................................................20

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015).....................................................................................................26

*In re Google Inc. Gmail Litig.*,
No. 13-md-02430, 2014 WL 1102660 (N.D. Cal. Mar. 18, 2014)...........................................27

*Gorgas v. Amazon.com, Inc.*,
No. 22-cv-5159, 2023 WL 4173051 (N.D. Ill. June 23, 2023)................................................42

*Graham v. Noom, Inc.*,
533 F. Supp. 3d 823 (N.D. Cal. 2021) ......................................................................................31

*Green v. Beth*,
663 Fed. App'x 471 (7th Cir. 2016) ...........................................................................................6

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023)....................42

*Grob v. Sw. Credit Sys.*,
L.P., 20 F.4th 1184 (7th Cir. 2021)....................35

*Grossman v. GEICO Cas. Co.*,
No. 21-cv-2789, 2022 WL 1656593 (2d Cir. May 25, 2022)....................21, 22

*Gruber v. Yelp Inc.*,
55 Cal. App. 5th 591 (5th Dist. 2020)....................31

*Han v. Hertz Corp.*,
784 N.Y.S.2d 106 (1st Dep't 2004)....................41

*Hart v. TWC Prod. & Tech. LLC*,
526 F. Supp. 3d 592 (N.D. Cal. 2021)....................42

*Haskins v. Symantec Corp.*,
654 F. App'x 338 (9th Cir. 2016)....................43

*Health Promotion Specialists, LLC v. S.C. Bd. of Dentistry*,
743 S.E.2d 808 (S.C. 2013)....................42

*Heard v. Beckton, Dickinson & Co.*,
440 F. Supp. 3d 960 (N.D. Ill. 2020)....................6

*Heeger v. Facebook, Inc.*,
509 F. Supp. 3d 1182 (N.D. Cal. 2020)....................45, 46

*Henderson v. Sheahan,*,
196 F.3d 839 (7th Cir. 1999)....................10

*Hernandez v. Hillsides, Inc.*,
211 P.3d 1063 (Cal. 2009)....................46

*Hill v. Nat'l Collegiate Athletic Assn.*,
865 P.2d 633 (Cal. 1994)....................47

*Hinton v. Trans Union, LLC*,
654 F. Supp. 2d 440 (E.D. Va. 2009)....................23

*Hoagland v. Town of Clear Lake*,
415 F.3d 693 (7th Cir. 2005)....................22

*Holeman v. Neils*,
803 F. Supp. 237 (D. Ariz. 1992)....................41

*Holmes v. Behr Process Corp.*,
No. 2:15-cv-0454-WMA, 2015 WL 7252662 (N.D. Ala. Nov. 17, 2015) ..............................40

*Howard v. Blue Ridge Bank*,
371 F. Supp. 2d 1139 (N.D. Cal. 2005) ..........................................................................24

*Hubbert v. Dell Corp.*,
359 Ill.App.3d 976,987 (5th Dist. 2005)..........................................................................17

*Huyck v. Milwaukee Area Technical College*,
No. 1:21-cv-1448, 2022 WL 1048862 (E.D. Wis. Apr. 6, 2022) ..........................................48

*In re iPhone Application Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012) .......................................................................... *passim*

*Jaramillo v. Experian Info. Sols., Inc.*,
155 F. Supp. 2d 356 (E.D. Pa. 2001) ..............................................................................24

*Jarzyna v. Home Props., L.P.*,
185 F. Supp. 3d 612 (E.D. Pa. 2016) ..............................................................................42

*Johnson v. Jos. A. Bank Clothiers, Inc.*,
No. 2:13-cv-756, 2014 WL 4129576 (S.D. Ohio Aug. 19, 2014) ..........................................43

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) ..............................................................................26

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ........................................................................................44

*Kim v. Carter's Inc.*,
598 F.3d 362 (7th Cir. 2010) ..........................................................................................43

*Kirksey v. Am. Bankers Ins. Co. of Fla.*,
114 F. Supp. 2d 526 (S.D. Miss. 2000)............................................................................21

*Knudson v. Wachovia Bank*,
513 F. Supp. 2d 1255 (M.D. Ala. 2007) ..........................................................................24

*Korte v. Allstate Ins. Co.*,
48 F. Supp. 2d 647 (E.D. Tex. 1999)..............................................................................21

*Kurowski v. Rush Sys. for Health*,
683 F. Supp. 3d 836 (N.D. Ill. 2023) ................................................................................7

*Lakes v. Ubisoft, Inc.*,
No. 24-cv-06943-TLT, 2025 WL 1036639 (N.D. Cal. Apr. 2, 2025) ..............................11, 13

*Lewis v. Experian Info. Sols., Inc.*,
No. 23-cv-857, 2024 WL 1308705 (E.D.N.Y. Mar. 27, 2024)....39

*Librizzi v. Ocwen Loan Servicing, LLC*,
120 F. Supp. 3d 1368 (S.D. Fla. 2015)....38

*Lockey v. CMRE Fin. Servs., Inc.*,
No. 1:11-cv-70, 2011 WL 2971085 (S.D. Miss. July 20, 2011)....41

*MacKay v. Super. Ct.*,
188 Cal. App. 4th 1427 (2010)....20, 21

*Madkin v. Automation Pers. Servs., Inc.*,
No. 2:21-cv-1177, 2023 WL 12036560 (N.D. Ala. Apr. 17, 2023)....41

*Maislin Indus. v. Primary Steel, Inc.*,
497 U.S. 116 (1990)....20

*Marcus v. AT&T Corp.*,
138 F.3d 46 (2d. Cir. 1998)....20

*McCann v. Iroquois Mem'l Hosp.*,
622 F.3d 745 (7th Cir. 2010)....27

*McCarthy Fin., Inc. v. Premera*,
182 Wash.2d 936 (2015)....21

*McLiechey v. Bristol W. Ins. Co.*,
408 F. Supp. 2d 516 (W.D. Mich. 2006)....21

*Meyer v. Cnty. of San Diego*,
21-cv-341-RSH-BLM, 2025 WL 449747 (S.D. Cal. Feb. 10, 2025)....45

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017)....17

*Mills v. Polar Molecular Corp.*,
12 F.3d 1170 (2d Cir. 1993)....8

*Minotty v. Baudo*,
42 So. 3d 824 (Fla. Dist. Ct. App. 2010)....31

*Motorola, Inc. v. Lemko Corp.*,
609 F. Supp. 2d 760 (N.D. Ill. 2009)....33

*Multiven, Inc. v. Cisco Sys., Inc.*,
725 F. Supp. 2d 887 (N.D. Cal. 2010)....34

*Murphy v. White Hen Pantry Co.*,
691 F.2d 350 (7th Cir. 1982) ....................19

*Nagel v. ADM Investor Servs., Inc.*,
995 F. Supp. 837 (C.D. Ill. 1998) ....................48

*Naporano Iron & Metal Co. v. Am. Crane Corp.*,
79 F. Supp. 2d 494 (D.N.J. 1999) ....................44

*Nemykina v. Old Navy, LLC*,
461 F. Supp. 3d 1054 (W.D. Wash. 2020)....................44

*In re New Jersey Title Ins. Litig.*,
683 F.3d 451 (3d Cir. 2012)....................21

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016)....................45

*Nunes v. Rushton*,
299 F. Supp. 3d 1216 (D. Utah 2018)....................42

*O'Connor v. Ford Motor Co.*,
477 F. Supp. 3d 705 (N.D. Ill. 2020) ....................44

*Olson v. Champaign Cnty., Ill.*,
784 F.3d 1093 (7th Cir. 2015) ....................5

*P & P Marketing, Inc. v. Ditton*,
746 F. Supp. 1354 (N.D. Ill. 1990) ....................48

*In re Packaged Ice Antitrust Litig.*,
779 F. Supp. 2d 642 (E.D. Mich. 2011)....................44

*PDC Lab'ys, Inc. v. Hach Co.*,
No. 09-1110, 2009 WL 2605270 (C.D. Ill. Aug. 25, 2009) ....................10, 17

*Pearson v. Philip Morris, Inc.*,
361 P.3d 3 (Or. 2015) ....................41

*People v. Ledesma*,
795 N.E.2d 253 (Ill. 2003)....................31

*Peters v. Mundelein Consol. High Sch. Dist. No. 120*,
No. 21-cv-0336, 2022 WL 393572 (N.D. Ill. Feb. 9, 2022)....................29

*In re Pharmatrak, Inc.*,
329 F.3d 9 (1st Cir. 2003)....................25, 29

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
631 F.3d 436 (7th Cir. 2011) ....................................................................................8

*Popa v. Harriet Carter Gifts, Inc.*,
52 F.4th 121 (3d Cir. 2022) ......................................................................................31

*Popa v. Harriet Carter Gifts, Inc.*,
No. 2:19-CV-450, 2025 WL 896938 (W.D. Pa. Mar. 24, 2025) ..........................................10

*Proctor & Gamble Co. v. Haugen*,
947 F. Supp. 1551 (D. Utah 1996)..............................................................................40

*Pucillo v. Nat'l Credit Sys., Inc.*,
66 F.4th 634 (7th Cir. 2023) .....................................................................................45

*Purcell v. Bank of Am.*,
659 F. 3d 622 (7th Cir. 2011) ....................................................................................24

*Ramirez v. LexisNexis Risk Sols.*,
729 F. Supp. 3d 838 (N.D. Ill. 2024) ..........................................................................42

*Raymond v. Avectus Healthcare Sols., LLC*,
No. 1:15-cv-559, 2020 WL 3470461 (S.D. Ohio Mar. 27, 2020) ........................................41

*Redmond v. Upfield US Inc.*,
No. 1:22-cv-06334, 2024 WL 4347113 (N.D. Ill. Sept. 30, 2024).......................................44

*Rene v. G.F. Fishers, Inc.*,
817 F. Supp. 2d 1090 (S.D. Ind. 2011)........................................................................30

*Renninger v. ChexSystems*,
No. 98-cv-669, 1998 WL 295497 (N.D. Ill. May 22, 1998)...............................................38

*Riley v. Gen. Motors Acceptance Corp.*,
226 F. Supp. 2d 1316 (S.D. Ala. 2002)........................................................................24

*Roberts v. Wells Fargo Bank, N.A.*,
No. 4: 12-cv-200, 2013 WL 1233268 (S.D. Ga. Mar. 27, 2013)..........................................21

*Robins v. Glob. Fitness Holdings, LLC*,
838 F. Supp. 2d 631 (N.D. Ohio 2012).........................................................................40

*Rodriguez v. Autotrader.com, Inc.*,
762 F. Supp. 3d 921 (C.D. Cal. 2025) .........................................................................32

*Rodriguez v. Google LLC*,
No. 20-cv-04688, 2021 WL 2026726 (N.D. Cal. May 21, 2021)...................................26, 27

*Roe v. Amgen Inc.*,
No. 2:23-cv-07448-MCS-SSC, 2024 WL 2873482 (C.D. Cal. June 5, 2024)........................31

*Rothstein v. Balboa Ins. Co.*,
794 F.3d 256 (2d Cir. 2015)..........................................................................................21

*Safeco Ins. Co. of Am. v. Burr*,
551 U.S. 47 (2007)........................................................................................................39

*Saho v. Equifax, Inc.*,
No. 1:19-cv-04252-LMM-RGV, 2019 WL 11499337 (N.D. Ga. Oct. 31, 2019) ...............................................................................................................36

*Shannon v. Allstate Corp.*,
No. 1:20-CV-448-LY, 2021 WL 8083333 (W.D. Tex. May 24, 2021)................................49

*Shaulis v. Nordstrom, Inc.*,
865 F.3d 1 (1st Cir. 2017)..............................................................................................43

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,
476 U.S. 409 (1986)......................................................................................................20

*Silver v. Stripe Inc.*,
No. 4:20-cv-08196, 2021 WL 3191752 (N.D. Cal. July 28, 2021) .....................................12

*Sissoko v. City of Newark*,
No. 20-15717, 2021 WL 2070583 (D.N.J. May 21, 2021)..................................................19

*Sloan v. Anker Innovations Ltd.*,
711 F. Supp. 3d 946 (N.D. Ill. 2024) ..................................................................................8

*Smith v. Equifax Info. Servs., LLC*,
522 F. Supp. 2d 822 (E.D. Tex. 2007)..............................................................................24

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001) .........................................................................................12

*Standfacts Credit Servs. v. Experian Info. Sols., Inc.*,
No. CV04-0358, 2006 WL 4941834 (C.D. Cal. Oct. 12, 2006) .........................................41

*Stein v. Edward-Elmhurst Health*,
No. 23-CV-14515, 2025 WL 580556 (N.D. Ill. Feb. 21, 2025) ..........................................31

*Stergiopoulos & Ivelisse Castro v. First Midwest Bancorp, Inc.*,
427 F.3d 1043 (7th Cir. 2005) .................................................................................8, 23, 27

*Steven v. Union Planters Corp.*,
No. CIV. A. 00-cv-1695, 2000 WL 33128256 (E.D. Pa. Aug. 22, 2000) ...............................21

*Stutts v. Travelers Indem. Co.*,
682 S.E.2d 769 (N.C. Ct. App. 2009) ....................21

*Svenson v. Google Inc.*,
65 F. Supp. 3d 717 (N.D. Cal. 2014) ....................42

*Tenore v. AT & T Wireless Servs.*,
962 P.2d 104 (Wash. 1998)....................21

*Tex. Com. Energy v. TXU Energy, Inc.*,
413 F.3d 503 (5th Cir. 2004) ....................20

*Thornton v. Equifax, Inc.*,
619 F.2d 700 (8th Cir. 1980) ....................23

*In re TikTok, Inc. In-App Browser Litig.*,
No. 24 C 2110, 2024 WL 4367849 (N.D. Ill. 2024)....................31

*In re Title Ins. Antitrust Cases*,
702 F. Supp. 2d 840 (N.D. Ohio 2010)....................21

*Topshelf Mgmt. v. Campbell–Ewald Co.*,
117 F. Supp. 3d 722 (M.D.N.C. 2015) ....................44, 45

*In re Trans Union Corp. Privacy Lit.*,
211 F.R.D. 328 (N.D. Ill. 2002)....................47

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................22

*United Cos. Lending Corp. v. Peacock*,
475 S.E.2d 601 (Ga. 1996)....................48

*United States v. Reed*,
575, F.3d 900, 917 (9th Cir. 2009) ....................28

*United States ex rel. Sibley v. Univ. of Chi. Med. Ctr.*,
44 F. 4th 646 (7th Cir. 2022) ....................5

*In re USAA Data Sec. Litig.*,
621 F. Supp. 3d 454 (S.D.N.Y. 2022)....................47

*Valiente v. StockX, Inc.*,
645 F. Supp. 3d 1331 (S.D. Fla. 2022) ....................17

*Van Buren v. United States*,
593 U.S. 374 (2021)....................33, 34

*Vasil v. Kiip, Inc.*,
16-cv-09937, 2018 WL 1156328 (N.D. Ill. Mar. 5, 2018) ....28, 29

*Vess v. Ciba-Geigy Corp.* USA,
317 F.3d 1097 (9th Cir. 2003) ....43

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*,
20 F.3d 771 (7th Cir. 1994) ....8

*Walkowiak v. Bridgepoint Educ., Inc.*,
No. 2:16-cv-438, 2017 WL 2418391 (N.D. Ind. 2017) ....44, 45

*Warth v. Seldin*,
422 U.S. 490 (1975) ....7

*Washington v. Flixbus, Inc.*,
No. 3:25-cv-00212, 2025 WL 1592961 (S.D. Cal. June 5, 2025) ....10, 11

*Weimin Chen v. Sierra Trading Post, Inc.*,
No. 2:18-cv-1581, 2019 WL 3564659 (W.D. Wash. Aug. 6, 2019) ....17

*Westra v. Credit Control of Pinellas*,
409 F.2d 825 (7th Cir. 2005) ....24

*Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*,
536 F.3d 663 (7th Cir. 2008) ....44

*In re Yahoo Mail Litig.*,
7 F. Supp. 3d 1016 (N.D. Cal. 2014) ....25

*Young v. Experian Info. Sols., Inc.*,
No. 3:22-cv-50222, 2025 WL 964877 (N.D. Ill. Mar. 31, 2025) ....39

*Young v. Grand Canyon Univ., Inc.*,
57 F.4th 861 (11th Cir. 2023) ....43

*Youngblood-W. v. Aflac Inc.*,
No. 4:18-cv-83, 2018 WL 10562576 (M.D. Ga. Nov. 9, 2018) ....10

*In re Zynga Priv. Litig.*,
750 F.3d 1098 (9th Cir. 2014) ....28, 29

**Federal Statutes**

15 U.S.C. § 1681b ....23, 35

15 U.S.C. § 1681e ....5

15 U.S.C. § 1681n ....38, 39

15 U.S.C. § 1681t.....23, 24

18 U.S.C. § 1030.....32, 33, 34

18 U.S.C. § 2510.....27, 28, 30

18 U.S.C § 2511.....25, 26, 27

18 U.S.C. § 3117.....27, 28

Pub. L. No. 99-508 § 101(a)(5).....29

**State Statutes**

18 Pa. Cons. Stat. Ann. § 5702.....31

18 Pa. Cons. Stat. Ann. § 5703.....30

18 Pa. Cons. Stat. Ann. § 7611.....32

Ala. Code § 8-19-10(e).....40

Cal. Penal Code § 502.....32

Cal. Penal Code § 630.....30

Cal. Penal Code § 638.50.....32

Cal. Penal Code § 638.51.....32

Fla. Stat. § 934.01.....30

Ill. Comp. Stat. Ann. 5/14-1.....30

Ind. Code § 24-5-0.5-5.....40

N.Y. Gen. Bus. Law § 899-aa.....47

N.Y. Gen. Bus. Law § 899-bb.....47

O.C.G.A. § 13–6–11.....47

Tex. Bus. & Com. Code § 17.505(a).....40

Utah Code Ann. 1953 § 13-11a-4.....40

**Rules and Regulations**

Fed. R. Civ. P. 8..... *passim*

Fed. R. Civ. P. 9 ........ *passim*

Fed. R. Civ. P. 11 ........ 19, 49

**Other Authorities**

Restatement (Second) of Torts § 892A (1979) ........ 47

Defendants the Allstate Corporation ("AllCorp"), Allstate Insurance Company ("AIC"), Allstate Vehicle and Property Insurance Company ("AVPIC"), Arity, LLC ("Arity"), Arity 875 ("Arity 875"), LLC, and Arity Services, LLC ("Arity Services") (together, "Defendants") hereby move the Court to dismiss the Consolidated Complaint ("Complaint").

**INTRODUCTION**

Thirty-nine plaintiffs have thrown thirty-eight overlapping claims at the wall in the hopes that something sticks. The problem with those claims is that they are not based on facts, but rather on conjecture, vague group pleading, and an unprecedented reliance on "information and belief" about things that each plaintiff knows or should know is true or not true.

Plaintiffs allege that they downloaded mobile applications ("Apps") in which "Defendants" had installed software development kits ("SDKs"), and that those SDKs are able to "harvest" data about Plaintiffs' driving behavior and use that data against them in setting insurance rates. But Plaintiffs never allege, as they must, that their data actually *has* been (and not just *might have* been) improperly captured, much less improperly used. Plaintiffs also admit that they affirmatively chose to download the Apps on their phones and had to click "accept" to terms and conditions; they should know what they read, or chose not to read, and to what they agreed. And Plaintiffs select and purchase their own insurance policies; they should know if those rates have gone up, or not, and by how much, or at least have taken the time to investigate publicly filed rates before burdening this Court with their massive (yet repetitive) Complaint.

So, as a threshold matter, none of Plaintiffs' claims alleges facts that any of them actually had their personal data disclosed to Defendants. Instead, they allege that the SDKs installed on the Apps have the purported *ability* to collect personal data, and because the SDK has the purported *ability* to disclose that data, Plaintiffs allege that their own personal data "must have" been

disclosed. But courts in recent years repeatedly have considered—and rejected—the same claims based on such technologies under Rule 8(a) and, for those claims that sound in fraud, Rule 9(b).

Separately, the Complaint should be dismissed in its entirety because Plaintiffs' *own* allegations show that any of the purported disclosures of their public driving data were made with their consent. Plaintiffs notably never plead facts amounting to a lack of consent, but instead just offer legal conclusions. Worse, the facts actually alleged demonstrate that Plaintiffs were notified of (and, although unnecessary for dismissal, *even admit they actually reviewed*) terms and privacy policies relating to their Apps that plainly disclose the possibility that their personal data could be disclosed. Separately, the terms and privacy policies incorporated by reference in the Complaint were available to each Plaintiff and are equally sufficient to establish consent.

Even beyond these fatal flaws, the Complaint should be dismissed because Plaintiffs' primary theory of harm—that their insurance rates went up as a result of the disclosures of their data—is legally and factually wrong. Legally, this theory is barred by the filed-rate doctrine, which prevents consumers from seeking damages for the way insurance carriers calculate rates when those rates are, as they must be, publicly filed with state regulators. Factually, this theory rests on utter conjecture, as Plaintiffs plead only on "information and belief" that their insurance rates were improperly increased by the purported App disclosures, and fail to plead any facts substantiating these allegations, including whether their own rates changed at all during the relevant time period.

Finally, various categories of Plaintiffs' claims suffer from one or more other fatal infirmities. Plaintiffs' state common law and statutory claims are preempted by the Fair Credit Reporting Act ("FCRA"), which in turn must be dismissed because Congress chose *not* to require consent for such data collection and use at all. Likewise, Plaintiffs' statutory wiretapping claims are foreclosed by statutory exceptions or carveouts based on consent, the type of data involved, or

the manner of device used. And all of Plaintiffs' state law claims under unfair and deceptive trade practices statutes fail for several independent reasons, including the lack of actual damages, their consent to the alleged disclosures, and their failure to plead any deception or misrepresentation under Rule 9(b). A summary of the various bases for dismissal is attached as **Exhibit A**.

## BACKGROUND

### A. The Parties

Thirty-nine Plaintiffs purport to have used one or more of the Apps that Plaintiffs are "informed and believe[]" include an SDK that tracks driver behavior. Compl. [ECF No. 46] ¶¶ 19, 28, 37, 46, 55, 65, 74, 83, 92, 101, 110, 119, 128, 137, 146, 156, 165, 174, 183, 192, 202, 211, 220, 229, 238, 247, 256, 266, 276, 286, 296, 306, 315, 324, 333, 342, 352, 361, 370. Plaintiffs allege that, "[t]ogether, Defendants conspired to collect and sell the driving behavior data." *Id.* ¶ 4. They allege that the "Arity Defendants" developed and installed the "Arity SDK," *id.* ¶¶ 3, 5, mostly into Apps that include Life360, SiriusXM, GasBuddy, Fuel Rewards, MyRadar, WeatherBug, Streetwise, GPS Driving Route, Fuelzee, and Ago, *id.* ¶¶ 405, 419 (and a few into Defendants' own apps, such as Drivewise, Routely, and the "Allstate" app), *id.* ¶¶ 369, 423, 428(f).

Plaintiffs spend nearly 100 pages identifying themselves, but with cut-and-paste boilerplate language. Each Plaintiff alleges that he or she downloaded a specific App (of the 12 Apps identified in the Complaint, only 7 allegedly were used by a Plaintiff), "in or around" which year he or she did so, and that they actually "reviewed the prominent information about the nature and function" of the App before clicking "accept."[1] *See*, *e.g.*, Compl. ¶ 18.

[1] One Plaintiff omitted the allegation that they "reviewed the prominent information about the nature and function of the app presented" (which 38 other Plaintiffs allege), and instead claims she was "not provided meaningful notice" of what the Apps she downloaded and signed up for would do. Compl. ¶ 73. Without more, this difference is without legal significance.

*None* of the 39 Plaintiffs pleads a single allegation that plausibly shows that any of them *actually* had their information improperly collected or disclosed. Instead, Plaintiffs rely entirely on a hypothetical and conclusory inference that, because these Apps allegedly integrated the Arity SDK, in each instance they must have disclosed Plaintiffs' own driving information. *Id.* ¶ 439.

Plaintiffs' central allegation of harm is that all of this hypothetically collected and disclosed data then was hypothetically used "to calculate insurance rates for Plaintiffs." *Id.* ¶ 1. Again, there are no allegations of how any individual Plaintiff's rates went up, why they did so, how insurance rates were calculated, or that the rates were filed with state departments of insurance.

Plaintiffs also improperly group-plead the Defendants. Plaintiffs' own pleadings acknowledge that Defendants are distinct legal entities. AllCorp is the parent company of AIC and AVPIC, which are both insurance companies (together with AllCorp, "the Allstate Defendants"). Defendants Arity and Arity 875 collect and analyze data, while Arity Services receives certain data from Arity 875 to provide to insurance companies (together with Arity and Arity 875, "the Arity Defendants"). *Id.* ¶¶ 377–87. Critically, the Arity Defendants, by their very nature, do not sell insurance, collect premiums, nor directly develop any insurance company's rating plan. Yet "Defendants" are lumped together in virtually every allegation and every claim.

## **LEGAL STANDARD**

A complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The facts alleged must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But courts "need not accept as true statements of law or unsupported conclusory factual allegations." *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021), as Rule 8's "plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (pleading cannot rely on "labels and conclusions,"

"a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement") (citation modified); *Twombly*, 550 U.S. at 555 (a court is "not bound to accept as true a legal conclusion couched as a factual allegation"). For claims sounding in fraud, the complaint must clear the heightened pleading requirements of Rule 9(b), and describe the "who, what, when, where and how" of the fraud, i.e., "the first paragraph of any newspaper story." *United States ex rel. Sibley v. Univ. of Chi. Med. Ctr.*, 44 F. 4th 646, 655 (7th Cir. 2022) (citation omitted).

## <u>ARGUMENT</u>

### I. The Complaint Should Be Dismissed in Its Entirety Under Rules 8 and 9(b) Because the Allegations are Too Vague and Conjectural to Provide Sufficient Notice.

#### A. Each Plaintiff's failure to allege that his or her data *actually* was collected and disclosed warrants dismissal.

Plaintiffs must allege more than a "sheer possibility that a defendant has acted unlawfully." *Olson v. Champaign Cnty., Ill.*, 784 F.3d 1093, 1099 (7th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678). Here, not one Plaintiff alleges that *their own data*—rather than theoretical or aggregated data—was improperly collected, disclosed, and used.

Plaintiffs instead allege that Defendants employed tools that *could* collect and disclose personal and sensitive information. This generalized allegation is not enough. *See Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1123 (S.D. Cal. July 12, 2023) (dismissing complaint based on allegations of what could happen if a user visited defendant's website and interacted with embedded code). What Plaintiffs fail to do—across 240-pages of cut-and-paste allegations—is "factually explain their *personal* participation in any of this." *Id.* (emphasis added). Instead, Plaintiffs ask this Court to infer they were each individually harmed based on "conjectures and hypothetical scenarios" of what users like themselves *might* have experienced. *B.K. v. Eisenhower Med. Ctr.*, 721 F. Supp. 3d 1056, 1064 (C.D. Cal. Feb. 29, 2024) (dismissing complaint for failure

"to allege any specificity" as to what data "was allegedly disclosed or when it was disclosed"), *partial reconsideration on other grounds*, 2024 WL 2037404 (C.D. Cal. Apr. 11, 2024).

For instance, Plaintiffs' allegations rest on generalized descriptions that they are "*informed and believe[]*" that certain apps integrate Defendants' SDK and speculate that these SDKs "harvested" a range of data from their phones. *See*, *e.g.*, Compl. ¶¶ 19, 28, 37, 46 (emphasis added).[2] These allegations only describe what *could* occur when such software is present—not what *did occur* with respect to any individual Plaintiff. Similarly, when detailing the "types of data" allegedly collected, every Plaintiff offers the same generic list of categories of data that the SDK *might* harvest from a phone. *See*, *e.g.*, *id*. ¶¶ 55, 65, 74, 83, 92, 101. But having the *ability* to collect data is not the same as having actually collected or disclosed data. *See B.K.*, 721 F. Supp. 3d at 1064. (Indeed, for the data Defendants allegedly collected from "in-car devices and apps," *see* Compl. ¶¶ 1, 13, the Complaint offers *no detail at all*).

Similarly, Plaintiffs speculate that their data is "in the possession of third parties" without explaining how it got there or who received it. *See*, *e.g.*, *id*. ¶¶ 23, 32, 41, 50, 60, 69. Plaintiffs likewise allege only on threadbare "information and belief" that third parties "continue to possess and utilize" their personal data. *Id*. ¶ 544. Further, Plaintiffs allege these third parties include "insurers" who now make them "pa[y] more for insurance," *see*, *e.g.*, *id*. ¶¶ 14, 21, but only nine

[2] Plaintiffs plead that they are "informed and believe[] that the apps integrate an SDK provided by Defendants." *See*, *e.g.*, Compl. ¶¶ 19, 55, 58. Pleading on "information and belief" is typically only appropriate where facts are particularly in [the] possession and control of [the] defendant." *Green v. Beth*, 663 F. App'x 471, 473–74 (7th Cir. 2016) (quotation omitted). Courts dismiss claims pleaded on information and belief where these threshold requirements go unmet. *See Heard v. Beckton, Dickinson & Co.*, 440 F. Supp. 3d 960, 969 (N.D. Ill. 2020) (dismissing claim pleaded on information and belief). In their Complaint, Plaintiffs cite articles stating the Arity SDK has been integrated into third-party apps like Drivewise, Life360, GasBuddy, WeatherBug, and MyRadar, *see* Compl. ¶¶ 405 n. 22, 441 n. 50, but only a single article suggesting that Arity "appears to have a partnership" with Sirius XM, and "may receive data" from it. This is plainly insufficient, even as a generalized allegation. Worse, Plaintiffs provide no factual support to suggest that the Arity SDK was integrated into Routely, Fuel Rewards, Streetwise, GPS Driving Route, Fuelzee, or Ago (as alleged in *id*. ¶¶ 405, 419).

out of the thirty-nine named Plaintiffs even *identify* their purported auto insurance providers. *See id*. ¶¶ 57, 148, 194, 268, 278, 288, 344 (seven plaintiffs insured by Allstate); *id.* ¶ 258, 278 (two plaintiffs insured by National General); *id.* ¶ 298 (one plaintiff insured by Esurance). (And, of course, consumers are free to change insurers if they are unhappy with their rates.)

These omissions are fatal. As in *Cousin*, Plaintiffs' failure here to allege *facts* about their "personal" participation (rather than potential participation) requires dismissal. 681 F. Supp. 3d at 1123. In *Cousin*, the plaintiffs relied on generalized descriptions of what could happen when a user interacts with a website containing embedded third-party code. *Id*. at 1124. The Court held that plaintiffs could not "maintain their theory of the case absent" factual support showing that they themselves engaged with the website in a manner that resulted in a disclosure of *their* information. *Id*. at 1123–24. Plaintiffs' Complaint here should be dismissed for the same reasons. As this Court recently held, plaintiffs "cannot reasonably expect to bring a lawsuit related to the invasion" of their privacy but "completely evade revealing" the factual basis of that alleged invasion: what of *their* data was actually disclosed, to whom, and how each Plaintiff was *individually* harmed. *See Kurowski v. Rush Sys. for Health*, 683 F. Supp. 3d 836, 843 (N.D. Ill. 2023).

### B. Plaintiffs' shotgun pleading of alleged harms that may have been suffered by some class members are insufficient to support *their* allegations.

Plaintiffs cannot evade their pleading burden by generalizing from theoretical group-wide harms to harms to themselves. *See Warth v. Seldin*, 422 U.S. 490, 502 (1975) (a plaintiff "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class"); *Deschepper v. Midwest Wine & Spirits, Inc.*, 84 F. Supp. 3d 767, 783 (N.D. Ill. 2015) ("[Shotgun] pleadings make 'it virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.'").

Plaintiffs' pleading of hypothetical scenarios in which data *might* be gathered and where disclosures *might* occur and *could* affect insurance pricing fail under Rule 8, as well as Rule 9(b)'s heightened pleading standards "for allegations of fraud or mistake." *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth*, 99 F. 4th 928, 943 (7th Cir. 2024) (quoting Fed. R. Civ. P. 9(b)). Rule 9(b) "ordinarily" requires describing the 'who, what, when, where, and how' of the fraud." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.,* 631 F.3d 436, 441–42 (7th Cir. 2011). This is especially true for fraud alleged against many defendants, because "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994).

Here, the gravamen of the Complaint sounds in fraud: Plaintiffs allege that Defendants "covertly" or "secret[ly]" collected their data, *see*, *e.g.*, Compl. ¶¶ 33, 39, 42, 48, 51, 58, 61, which denotes fraudulent intent (as alleged in many of their individual claims) and is therefore subject to Rule 9(b). *See Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (explaining that Rule 9(b) applies to "all averments of fraud, not [just] claims of fraud") (internal quotation marks omitted); *Mills v. Polar Molecular Corp*., 12 F.3d 1170, 1176 (2d Cir. 1993) (applying Rule 9(b) to breach of contract claim); *Sloan v. Anker Innovations Ltd.*, 711 F. Supp. 3d 946, 956 (N.D. Ill. 2024) (applying Rule 9(b) to consumer protection claims). Yet Plaintiffs' claims fail to include *any* particularized allegation that their own personal data was disclosed to third parties, much less used to make underwriting decisions. This requires dismissal.

## II. The Complaint Should Be Dismissed Because Plaintiffs Do Not and Cannot Allege That They Did Not Consent to Data Collection.

Across all jurisdictions, Plaintiffs' claims depend on the theory that they did not consent to data collection. That important premise is belied by the Complaint in three *separate* ways, each of which independently requires dismissal. *First*, Plaintiffs do not actually plead facts that they did

not consent, instead repeating allegations that *sound* like a lack of consent, but are not. *Second*, Plaintiffs plead themselves out of court by admitting that *every* Plaintiff (save one) "reviewed the prominent information" about their App.[3] *Third*, Plaintiffs incorporate by reference terms and conditions that on their face demonstrate actual consent. These infirmities are fatal to 34 of the 38 counts for which lack of consent constitutes an express element of the claim (Counts 1, 2, 9, 11, 14, 19, 32, 34), where lack of consent forms the factual nexus of the claim (Counts 1, 2, 4–16, 18–26, 28–38), or where consent is a defense to the claim (Counts 4, 5, 10, 12 and 31). *See* **Exhibit B** (Summary of How Consent Arguments Apply Across Counts).

### A. The Complaint Fails to Plausibly Allege Plaintiffs Did Not Consent to Defendants' Conduct.

Plaintiffs allege that they (1) "downloaded and used [the relevant app] on his [her] mobile phone"; (2) "reviewed the prominent information about the nature and function of the apps"; (3) "was not provided *meaningful* notice that Defendants would use the Apps to collect and share her [or his] Personal Data" (emphasis added); and (4)"was unaware that *Allstate and Arity's SDK* had been integrated into the apps at the time he [or she] installed and later when he [or she] used the apps" (emphasis added). Read carefully, then, Plaintiffs allege that they took an affirmative action to use the App, read at least *some* of the App's disclosures, knew or were on inquiry notice that there was *other* "non-prominent" information, and decided not to read more.

What Plaintiffs do *not* allege (and, as demonstrated below, *never* can allege) is that they did not know or were not on notice that they consented to the collection and use of their data. That is, they cannot allege a lack of consent under the applicable legal standard. It is not enough under *Twombly*, on these alleged facts—which show knowledge or notice, followed by a conscious

[3] Compl. ¶¶ 18, 27, 36, 45, 54, 64, 82, 91, 100, 109, 118, 127, 136, 145, 155, 164, 173, 182, 191, 201, 210, 219, 229, 237, 245, 255, 265, 275, 285, 295, 305, 314, 323, 332, 341, 351, 360, 369.

choice not to learn what was available—to include the conclusory allegation that the disclosure of data was "without consent." *Youngblood-W. v. Aflac Inc.*, No. 4:18-cv-83, 2018 WL 10562576, at *2 (M.D. Ga. Nov. 9, 2018), *aff'd,* 796 F. App'x 985 (11th Cir. 2019) (citation omitted); *Washington*, 2025 WL 1592961, at *3 ("Plaintiff alleges that he did not consent to the data practices at issue in the complaint. But the Court need not accept that legal conclusion as true.").[4]

### B. Plaintiffs' Allegations Regarding Their Review of App Disclosures Negate Any Conclusory Allegation of a Lack of Consent.

Separately, Plaintiffs' own Complaint includes factual allegations that *refute* the more general and conclusory allegation of consent. "[A] plaintiff can plead himself out of court by pleading facts that undermine the allegations set forth in his complaint." *Factory Mut. Ins. Co. v. Bobst Grp., Inc.*, No. 02-cv-283, 2002 WL 1263991, at *3 (N.D. Ill. June 5, 2002) (citing *Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999)). Plaintiffs have done precisely that.

Because Plaintiffs affirmatively allege that they "reviewed the prominent information about the nature and function of the app presented to [them] prior to downloading [their respective] app," *see*, n. 4, Plaintiffs read at least the "prominent information" disclosed regarding the App. Such "prominent information," Plaintiffs' allegations concede, included warnings that third parties would collect and use their data. Even in a section of the Complaint where Plaintiffs *conclude* there was a "failure to disclose," there are allegations showing plain warnings of third-party use. For example, just the screen shot of a single page of Life360 terms (which Plaintiffs chose to

[4] *Actual* notice of terms is not required—inquiry notice suffices. *PDC Lab'ys, Inc. v. Hach Co.*, No. 09-1110, 2009 WL 2605270, at *3 (C.D. Ill. Aug. 25, 2009) ("Though PDC does not state whether or not they read the Terms, it is inconsequential to the Terms' conspicuousness or PDC's accent thereto."); *Fteja v. Facebook, Inc.*, 841 F.Supp.2d 829, 835, 838–40 (S.D.N.Y. 2012) (enforcing terms of service: "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service" against user who clicked "Sign Up"); *Popa v. Harriet Carter Gifts, Inc.*, No. 2:19-cv-450, 2025 WL 896938, at *9 (W.D. Pa. Mar. 24, 2025) ("Courts have generally held that 'constructive knowledge alone is sufficient to establish consent to "browsewrap" terms and conditions when the website host placed the notice of the terms and agreements "prominently" and provided "easy access" to the full terms.'") (citation omitted).

include in the Complaint) refers to "location sharing," "motion sensors," "activity data," "driving safety," "crash detection," and a catch-all disclosure: "In addition to the above, your location data will be used in accordance with our Privacy Policy and your preferences may include sharing with third parties for purposes such as research, tailored advertising, and analytics." Compl. ¶ 447; *id.* ¶ 448 (similar disclosure for Fuel Rewards).

Courts consistently have found that such disclosures are sufficient to establish consent, and rejected arguments that disclosures must identify specific third parties (like "Arity" or "Allstate") or describe the "breadth" of "Defendant's *specific* practice" with respect to third-party data sharing. *Lakes v. Ubisoft, Inc.*, No. 24-cv-06943-TLT, 2025 WL 1036639, at *5-6 (N.D. Cal. Apr. 2, 2025) (emphasis added) (holding a "highly granular disclosure" not required where "a reasonable user would understand from the Privacy Policy that he or she is consenting to the use of cookies including by third parties"), *appeal docketed*, No. 25-2857 (9th Cir. May 2, 2025); *see also Washington v. Flixbus, Inc.*, No. 3:25-cv-00212, 2025 WL 1592961, at *4 (S.D. Cal. June 5, 2025) (dismissing without leave to amend: website "explicitly notif[ied] users of the data practices at issue by disclosing the use of cookies and tracking pixels to track certain data and disclose that data to [d]efendant's business partners, including marketing partners."). Similarly, the idea that a plaintiff may sue for lack of consent when he or she *chooses* not to be interested in the disclosed privacy policy or read its provisions is antithetical to precedent. *See Bonny v. Soc'y of Lloyd's*, 3 F.3d 156, 160 n.10 (7th Cir. 1993) ("We note . . . that a party to a contract has an obligation to read its provisions. It is a fundamental principle of contract law that a person who signs a contract is presumed to know its terms and consents to be bound by them.").

### C. The Actual Terms and Conditions of the Apps at Issue Affirmatively Negate Any Conclusory Allegation of a Lack of Consent.

"Courts consistently hold that terms of service and privacy policies… can establish consent to the alleged conduct challenged under various states wiretapping statutes and related claims." *Silver v. Stripe Inc.*, No. 4:20-cv-08196, 2021 WL 3191752, at *4 (N.D. Cal. July 28, 2021). Here, the Complaint should be dismissed on consent grounds for a third reason: although Plaintiffs strategically do not include terms for some of the Apps—or all of the terms for any of them—the Complaint references and (selectively) quotes the terms and conditions for the Apps at issue, so the Court may consider the actual content of those terms and conditions. *See* Defendants' Motion to Incorporation by Reference ("IBR"); IBR, Exhs. A–D. Consent in this case is confirmed not only by the most cursory review of the "prominent information" that Plaintiffs admit they reviewed when they downloaded and used the Apps, but also by the additional terms in the App policies. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (affirming court's review of documents outside of the pleadings, but attached thereto, as basis to hold extrinsic facts "fatally undermined" claim), *opinion amended on other grounds*, 275 F.3d 1187 (9th Cir. 2001).[5]

[5] Plaintiffs have conceded that the terms, conditions, and policies of Defendant-owned Apps affirmatively negate their conclusory allegations of lack of consent. Plaintiffs allege that "[t]o implement, User Based Insurance and collect telematics data, insurance companies have developed [Apps] that allow consumers to access information about their policies, make claims, request roadside assistance, and significantly, enable telemetric data collection." Compl. ¶ 397. Plaintiffs allege that because "only 17%" of "auto-insurance shoppers who were offered User Based Insurance . . . signed up," "Defendants devised a scheme to use other apps to track individuals." *Id.* ¶¶ 398–99. Specifically, Plaintiffs allege that the tracking and collection of their data was "done through *third-party apps* rather than those developed, published and associated with Defendants." *Id.* ¶ 400 (emphasis added). Because Plaintiffs concede that the alleged tracking occurred through third-party apps, and not Defendant-owned apps (*e.g.*, Drivewise, Routely, the "Allstate" app), any allegations of lack of Plaintiff consent as to those apps must be dismissed. The following Plaintiffs make allegations related to Defendant-owned Apps: (1) Toyette Flowers – Routely (Compl. ¶ 100); (2) Kimberly Kelly – Routely (*id.* ¶ 155); (3) Amanda Quam – Routely (*id.* ¶ 210); (4) Dorian Rochester – Routely (*id.* ¶ 237); (5) Tracy Tupper – Drivewise (*id.* ¶ 341); and (6) Eboni Wright – "Allstate" app (*id.* ¶ 369).

### 1. The Terms of Service and Privacy Policies Disclosed *What* Data Will Be Collected, *Why* It will be Collected, and *How* It Will be Shared.

The various Terms of Service, Terms and Conditions, and Privacy Policies (collectively, "App Agreements")[6] disclose far more information than the law requires to procure effective consent. *See*, *e.g.*, *Ubisoft, Inc.*, 2025 WL 1036639, at *5–6 ("highly granular disclosure" not required if users informed of third-party disclosure in general). These App Agreements expressly informed users that a wide range of personal and device data would be collected, including but not limited to: precise location information (via GPS, WiFi, Bluetooth), sensory and motion data from internal gyroscopes, accelerometers in smartphones, and events such as speed, acceleration, braking, and trip history. *See*, *e.g.*, IBR, Ex. D, *GasBuddy* App Agreements (10/3/18 (Ex. D-1 at 2), 05/01/20 (Ex. D-2 at 3), 05/07/21 (Ex. D-3 at 2), 07/13/22 (Ex. D-4 at 4), 01/30/23 (Ex. D-5 at 28), 06/26/24 (Ex. D-6 at 3)) (disclosing collection of "information about your driving habits, including, but not limited to, driving distance, speed, acceleration and braking habits . . . even if you are not logged in to the Service."); IBR, Ex. A, *Fuel Rewards* App Agreement (11/27/24) at 2 ("If you provide our mobile application with access to location services on your mobile device, we may also collect your precise location data, including through GPS."); IBR, Ex. B, *Routely* App Agreements (11/29/18 (Ex. B-1 at 3), 12/27/19 (Ex. B-2 at 4), 03/26/21 (Ex. B-3 at 4)) ("We collect personal data about your driving behavior and patterns, technical information about the devices you use, and information about your vehicle and its operation.");[7] IBR, Ex. C, *Life360* App Agreement (08/07/18 (Ex. C-10 at 8)) ("[We] will periodically access and collect information about your phone and driving activity that can be detected by the phone, including your location,

---

[6] *See* Exhs. A–D in Defendants' IBR (App Agreements for Fuel Rewards, Routely, Life360, & GasBuddy).

[7] *See also* IBR, Ex. B, *Routely* App Agreements (06/09/23 (Ex. B-5 at 2), 06/24/24 (Ex. B-6 at 3–4), 11/01/24 (Ex. B-7 at 3–4)) ("We collect […] geolocation coordinates, including latitude, longitude, and altitude, your direction of travel, Wi-Fi access points, and the time the information was recorded.").

the use and movement of the phone, the speed of your motor vehicle, etc.").[8] These conditions—agreed to by *anyone* who downloaded the Apps, including by their own admission *all* of the Plaintiffs—expressly disclose that geolocation and driving behavior are being collected and used. That is sufficient to dismiss all of Plaintiffs' claims.

Although not necessary for dismissal, various policies also indicated *why* the specified data was being collected—plainly disclosing that the telematic data being gathered might be used for risk modeling, the creation of driver profiles, and the pricing and underwriting of insurance products. *See*, *e.g.*, IBR, Ex. B, *Routely* App Agreements (11/29/18 (Ex. B-1 at 8), 12/27/19 (Ex. B-2 at 6), 03/26/21 (Ex. B-3 at 6), 05/25/22 (Ex. B-4 at 5), 06/24/24 (Ex. B-6 at 10)) ("Our insurance company business clients may also use your information to update their pricing and underwriting models[.]"); *id*. (11/01/24 (Ex. B-7 at 7)) ("We use personal information to perform actuarial studies, model development, and statistical analysis to create and refine our risk, driving behavior, and advertising models and analytics that allows us to create, deliver or improve our products and services, including providing services to our business clients."); IBR, Ex. C, *Life360* App Agreements (11/18/20 (Ex. C-1 at 6), 12/16/20 (Ex. C-2 at 6), 03/31/21 (Ex. C-3 at 6)) (data

[8] *See also* IBR, Ex. C, *Life360* App Agreements (05/20/20 (Ex. C-11 at 7–8), 04/16/21 (Ex. C-12 at 6), 11/02/21 (Ex. C-13 at 11), 11/19/22 (Ex. C-14 at 11)) (disclosing collection of "location, sensory and motion data from your mobile device in order to share location information, calculate and detect driving behavior and driving events"); IBR, Ex. C, *Life360* App Agreements (11/18/20 (Ex. C-1 at 3), 03/31/21 (Ex. C-3 at 3), 10/28/22 (Ex. C-4 at 3), 11/04/22 (Ex. C-5 at 3)) (disclosing collection of "sensory and motion data from your smartphone or mobile device, including information from the gyroscope, accelerometer, compass and Bluetooth, in order to calculate and detect driving events such as speeding, hard braking, crash detection and other events."); IBR, Ex. C, *Life360* App Agreements (04/05/23 (Ex. C-6 at 6), 11/01/23 (Ex. C-7 at 6), 03/05/24 (Ex. C-8 at 6)) ("We collect your location and motion information … [, and] Driving Event Information [incl.]… sensory and motion data from your mobile device including gyroscope, accelerometer, compass and Bluetooth (including, information related to your motion activity such as whether you are cycling, walking, running or driving, and information about your speed, acceleration and deceleration)."); IBR, Ex. C, *Life360* App Agreement (02/10/25 (Ex. C-9 at 4)) ("We collect precise geolocation data … about how and where you are moving such as your speed, altitude, and heading, and is collected from technology embedded in your mobile device, such as gyroscope, accelerometer, compass, and Bluetooth.").

used for "targeted advertising, calculate discounts, rewards or pricing offers by third parties such as insurance companies, and to perform various profiling activities in order to produce a score which may predict the level of driver riskiness, and to develop its risk predictive models for its own analytics, research or commercial purposes."); *id*. (10/28/22 (Ex. C-4 at 7), 11/04/22 (Ex. C-5 at 7)) ("Arity uses this information to analyze your driving behaviors, such as speed, change in speed and other aspects of how, how much, where and when you drive in order to predict driving risk and calculate a driving risk score."); IBR, Ex. D, *GasBuddy* App Agreements (05/07/21 (Ex. D-3 at 7), 07/13/22 (Ex. D-4 at 9), 01/30/23 (Ex. D-5 at 33), 06/26/24 (Ex. D-6 at 9)) ("Arity may also use this information . . . to perform various profiling activities in order to produce a score which may predict the level of driver riskiness, and to develop its risk predictive models for its own analytics purposes; and for mapping, traffic and navigation.").

Thus, contrary to Plaintiffs' assertions, and far beyond what is required by recent caselaw, Plaintiffs were provided clear notice of precisely *what* type of data was being collected and disclosed and, by using the Apps, consented to those disclosures. Moreover, various policies also specified that driving data might be shared with third parties—and even Arity itself. *See*, *e.g.*, IBR, Ex. A, *Fuel Rewards* App Agreement (11/27/24) at 6 ("we may also disclose personal information with retailers or brands, . . . [and] with companies that help us learn more about our customers."); IBR, Ex. B, *Routely* App Agreements (11/29/18 (Ex. B-1 at 10), 12/27/19 (Ex. B-2 at 6), 03/26/21 (Ex. B-3 at 7)) ("We may share your personal information and the other information we collect with all of our corporate-affiliate companies."); *id*. (05/25/22 (Ex. B-4 at 5–6), 06/09/23 (Ex. B-5 at 5–6), 06/24/24 (Ex. B-6 at 11)) ("We share your personal information with our business clients through which you receive Arity's features, products or services," and with "service providers who perform services on our behalf for a business purpose"); IBR, Ex. C, *Life360* App Agreements

(11/18/20 (Ex. C-1 at 6), 12/16/20 (Ex. C-2 at 6), 03/31/21 (Ex. C-3 at 6)) ("We share your personal information, driving event data and other information with Arity 875, LLC"); *id*. (02/10/25 (Ex. C-9 at 10)) ("we also disclose certain information, including precise geolocation data, movement data, and other information, about your use of our Services to select business partners for their own uses[.]"); IBR, Ex. D, *GasBuddy* App Agreements (05/7/21 (Ex. D-3 at 7), 07/13/22 (Ex. D-4 at 8–9), 01/30/23 (Ex. D-5 at 33), 6/26/24 (Ex. D-6 at 9)) ("GasBuddy may collect and share with Arity … your personal information and other data, including precise location, trip location, and driving event data such as speed, change in speed and other aspects of how, how much, where and when you drive[.]").

### 2. Every App Required Users to Consent to Terms of Service and Privacy Policies Before Accessing and Using the Underlying Service.

*Every* user had an opportunity to review the App Agreements applicable to the apps they downloaded—Plaintiffs allege they did so. *See* Compl. ¶¶ 18, 27, 36, 45, 54, 64, 82, 91, 100, 109, 118, 127, 136, 145, 155, 164, 173, 182, 191, 201, 210, 219, 229, 237, 245, 255, 265, 275, 285, 295, 305, 314, 323, 332, 341, 351, 360, 369. They even provide screenshots from two example App Agreements in the Complaint. *See* Compl. ¶¶ 447, 448. As Exhibits E through L attached to the IBR Motion further establish, the App Agreements were made conspicuously available to each Plaintiff on numerous occasions.

For example, the first time a Plaintiff downloads Fuel Rewards, they are prompted with registration forms that include clear hyperlinks to the App's Privacy Policy and Terms & Conditions, with a box requiring a user to affirmatively agree to the Terms & Conditions. *See* IBR, Ex. E. Likewise, a Plaintiff who downloads and registers for GasBuddy would be prompted to agree to the App's Terms and Conditions, which are provided in-full via hyperlink. *See* IBR, Ex. F. The pattern continues with Life360, Routely, Sirius XM, and DriveSense, all of which hyperlink

to their respective agreements on their registration screens. *See* IBR, Exhs. G–J. Across all Apps, Plaintiffs would have been provided clear, conspicuous, and accessible disclosures of all terms.

Such disclosures are regularly enforced. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017) (language, "[b]y creating an Uber account, you agree" clearly prompts users to read the Terms and indicates a binding contract will follow); *Hubbert v. Dell Corp.*, 359 Ill.App.3d 976,987 (5th Dist. 2005) (holding terms linked in an online order process in blue hyperlink were sufficiently accessible and conspicuous to bind plaintiff). Agreements made clearly available via hyperlinks are treated as binding contracts even if "the user is not required to check a separate dialog box to indicate assent," *see*, *e.g.*, *Brown v. Madison Reed, Inc.*, No. 21-cv-01233, 2021 WL 3861457, at *5 (N.D. Cal. Aug. 30, 2021), and even if they do not bother to read them. *See PDC Lab'ys*, 2009 WL 2605270, at *2 ("Whether a party has actually read terms and conditions … does not affect their accent or the terms' enforceability."); *Valiente v. StockX, Inc.*, 645 F. Supp. 3d 1331, 1338 (S.D. Fla. 2022) (enforcing terms and conditions where website "required Plaintiff to click a box acknowledging that he read the terms and conditions prior to creating his account").

As the foregoing exhibits demonstrate, Plaintiffs were able to review and, based on their own allegations, agreed to the applicable terms, conditions, or privacy policies for every App at issue in this case. As shown above, they could not have used the Apps as alleged *without* agreeing to these contracts. *See Weimin Chen v. Sierra Trading Post, Inc.*, No. 2:18-cv-1581, 2019 WL 3564659, at *3 (W.D. Wash. Aug. 6, 2019) (enforcing constructive notice of Terms of Use where website "explicitly states that the user agrees to the 'Terms' by placing the purchase order.").

For several, and likely all, Plaintiffs, their consent to the alleged disclosures is made evident a second time: after they installed the apps, they *necessarily* would have been prompted by their device's operating system (OS) to confirm the extent of data sharing. *See* IBR, Ex. B, *Routely* App

Agreement (06/24/24 (Ex. B-6 at 17)) ("Geolocation and other driving behavior information is collected via mobile apps only when Location Services is enabled on your device."). A user who installed Routely would have been met with a series of prompts from an iPhone's iOS, asking whether the app could "access your motion & fitness activity," or "use your location." IBR, Ex. K. Likewise, an Android user accessing DriveSense would have been prompted to grant location permission, and asked whether "DriveSense [can] access your physical activity." IBR, Ex. L.

Multiple layers of consent stood between Plaintiffs and the data they allege Defendants intercepted.[9] From downloading and registration, to installation and use, Plaintiffs had to manifest repeated consent to the very practices about which they complain. The Court should find the App Agreements fully bind Plaintiffs and require dismissal of Counts 1, 2, 4–16, 18–26, and 28–38.

## III. Plaintiffs' Claims Based on Alleged Harm from Insurance Costs and Outcomes Should be Dismissed.

### A. The "excessive insurance costs" Argument Cannot Be Made on "Information and Belief" Because Plaintiffs Possess the Relevant Information.

Every Plaintiff alleges that if their auto insurance premiums were "based on" personal data Defendants allegedly collected and disclosed, then (due to the "inaccuracy" of that data) their insurance premiums were "inflated."[10] Plaintiffs offer these allegations purely on "information and belief," *id*., and elsewhere allege that they have "experienced a substantial increase in insurance premiums compared to the steady and regular increases they would otherwise expect, and have

[9] The Complaint also omits that any insurer's use of their driving data is limited by Plaintiffs' affirmative consent. As discussed throughout, Plaintiffs *admit* that they did consent to third party use. *See*, *e.g.*, Compl. ¶ 341. And they do not—and, incidentally, will not be able to—allege that an insurance company did use such data without such *further* specific consents to an insurance company itself.

[10] *See* Compl. ¶¶ 21, 30, 39, 48, 58, 67, 76, 85, 94, 103, 112, 121, 130, 139, 149, 158, 167, 176, 185, 195, 204, 213, 222, 231, 240, 249, 259, 269, 279, 289, 299, 308, 317, 326, 335, 345, 354, 363, 372.

been quoted excessively high premiums." *Id*. ¶ 464. However, they plead *no factual allegation* that an increase in their insurance premiums had anything to do with their app-derived personal data.

Pleading on "information and belief" does "not 'allow a plaintiff to abdicate the responsibility of alleging the basic facts demonstrating [their] entitlement to relief." *Doe v. Franco Prods*., No. 99-cv-7885, 2000 WL 816779, at *2 (N.D. Ill. June 22, 2000) (quoting *Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 353 (7th Cir. 1982) (noting "Rule 11 tempers the liberal pleading standards in federal court" as applied to "information and belief" pleading), *aff'd sub nom.*, 347 F.3d 655 (7th Cir. 2003). Not a *single* Plaintiff provides the most rudimentary facts on how much they paid in premiums *before* or *after* the alleged misattribution of their data, much less tie that increase to the use of their data. That alone provides a basis for dismissing claims for which excess insurance costs constitute the predicate injury. *See infra*, Section VI.C.2 (discussing dismissal of state consumer protection statutes for lack of harm). Insurance rates are not "within Defendant's sole possession," as is typical in cases where "information and belief" pleading is acceptable under Rule 8. *Dante Valve Co. v. Republic Brass Sales, Inc*., No. 17-cv-2582, 2019 WL 1406583, at *3 (S.D. Cal. Mar. 28, 2019). There is no sound reason to permit such pleading here, where every Plaintiff should know who their insurance carrier is or was, how much they paid in premiums, how much their rates were purportedly increased, and how much of those increases they allegedly "would otherwise expect." *Sissoko v. City of Newark*, No. 20-15717, 2021 WL 2070583, at *2 n.4 (D.N.J. May 21, 2021) (observing "it is not clear why" plaintiff alleged a fact on information and belief when "[p]resumably, Plaintiff knows" the factual basis of the allegation).

### B. The Filed-Rate Doctrine Precludes Plaintiffs from Asserting Private Legal Claims on the Basis of Excess Insurance Rates.

Plaintiffs cannot plead an impact on their insurance rates for good reason—insurance rates and how they are determined are regulated by state Departments of Insurance, and insurance companies must charge the rates filed and/or approved by state regulators. Plaintiffs have not alleged that any Defendant deviated from the filed rates. This alone requires dismissal.

Separately, most of the state law claims should be dismissed because the core alleged harm—paying too much for insurance—cannot provide a basis for relief in states that apply the "filed-rate doctrine" to auto insurance. "The filed rate doctrine bars judicial recourse against a regulated entity based upon allegations that the entity's 'filed rate' is too high, unfair or unlawful." *Tex. Com. Energy v. TXU Energy, Inc.*, 413 F.3d 503, 507 (5th Cir. 2004) (citing *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409 (1986)). Rooted in principles of nondiscrimination and nonjusticiability, the doctrine holds that state law (and sometimes, federal law) cannot provide a basis to launch a collateral attack on an insurance rate that has been filed with the regulator. *Marcus v. AT&T Corp.*, 138 F.3d 46, 58–59 (2d. Cir. 1998). *See*, *e.g.*, *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000) ("Although the doctrine had come under some criticism, the Supreme Court reaffirmed it . . . and we are bound to follow it.") (internal citations omitted); *MacKay v. Super. Ct.*, 188 Cal. App. 4th 1427, 1448 (2010) ("the filed rate doctrine supports our conclusion that there is no tort liability for charging a rate that has been approved by the commissioner"). The Supreme Court repeatedly has applied the doctrine to cases directly or indirectly challenging rates filed with the relevant regulator. *See*, *e.g.*, *Maislin Indus. v. Primary Steel, Inc.*, 497 U.S. 116, 128 (1990) (noting "[d]espite the harsh effects of the filed rate doctrine, we have consistently adhered to it"). "Because the filed-rate doctrine prohibits collateral challenges to rates properly approved by the insurance commissioner, any such challenge raised

in the courts is due to be dismissed" and "judicial review" is "preclude[d]." *Ex parte Cincinnati Ins. Co.*, 51 So. 3d 298, 306 (Ala. 2010) (internal citation omitted).[11]

Of the twenty states under which Plaintiffs have brought suit, thirteen apply the filed-rate doctrine to preclude precisely the types of claims at issue here, rendering claims brought under those state's laws nonviable.[12] In fact, a federal court in Texas already has applied the filed-rate doctrine to grant a motion to dismiss in favor of an insurer in a case alleging insurance premium overcharges. *Korte*, 48 F. Supp. 2d at 649–53 (explaining how the doctrine "bars claims concerning an insurer's filed rating plan and rating factors—*i.e.*, the policyholder characteristics considered, and the process by which they are evaluated, as part of the process for how an insurer applies its filed rates to calculate a policyholder's premiums.").

---

[11] Although the doctrine has jurisdictional underpinning, federal courts treat it as another defense raised "in the context of a 12(b)(6) motion." *Roberts v. Wells Fargo Bank, N.A.*, No. 4: 12-cv-200, 2013 WL 1233268, at *9 (S.D. Ga. Mar. 27, 2013) ("The filed rate defense … is cognizable in a 12(b)(6) motion.); *In re Title Ins. Antitrust Cases*, 702 F. Supp. 2d 840, 881 (N.D. Ohio 2010) (holding the filed-rate doctrine "raises a defensive rather than a jurisdictional bar to Plaintiffs' recovery," making a 12(b)(6) motion the proper vehicle in which to raise the defense). The application of the doctrine "does not depend on the nature of the cause of action the plaintiff seeks to bring or the culpability of the defendant's conduct or the possibility of inequitable results." *Rothstein v. Balboa Ins. Co.*, 794 F.3d 256, 261–62 (2d Cir. 2015) (citation modified); *Tenore v. AT & T Wireless Servs.*, 962 P.2d 104, 108 (Wash. 1998) ("[T]his doctrine, which operates under the assumption that the public is conclusively presumed to have knowledge of the filed rates, has often been invoked rigidly, even to bar claims arising from fraud or misrepresentation").

[12] **Alabama (Count 7)**: *Ex parte Cincinnati Ins. Co.*, 51 So. 3d at 306; **California (Count 13)**: *MacKay*, 188 Cal. App. 4th at 1448; **Kentucky (Count 21)**: *Commw. ex rel. Chandler v. Anthem Ins. Cos., Inc.*, 8 S.W.3d 48, 53 (Ky. Ct. App. 1999); **Mississippi (Count 22)**: *Kirksey v. Am. Bankers Ins. Co. of Fla.*, 114 F. Supp. 2d 526, 529 (S.D. Miss. 2000); **Michigan (Count 23)**: *McLiechey v. Bristol W. Ins. Co.*, 408 F. Supp. 2d 516, 521 (W.D. Mich. 2006), *aff'd*, 474 F.3d 897 (6th Cir. 2000); **New Jersey (Count 24)**: *In re New Jersey Title Ins. Litig.*, 683 F.3d 451, 458-59 (3d Cir. 2012); **New York (Counts 25 and 26)**: *Grossman v. GEICO Cas. Co.*, No. 21-cv-2789, 2022 WL 1656593, at *2 (2d Cir. May 25, 2022); **North Carolina (Count 28)**: *Stutts v. Travelers Indem. Co.*, 682 S.E.2d 769, 771 (N.C. Ct. App. 2009); **Ohio**: *In re Title Ins. Antitrust Cases*, 702 F. Supp. 2d 840; **Pennsylvania (Count 31)**: *Steven v. Union Planters Corp.*, No. CIV. A. 00-cv-1695, 2000 WL 33128256, at *3 (E.D. Pa. Aug. 22, 2000); **South Carolina (Count 35)**: *Edge v. State Farm Mut. Auto. Ins. Co.*, 623 S.E.2d 387, 391–92 (S.C. 2005); **Texas (Count 36)**: *Korte v. Allstate Ins. Co.*, 48 F. Supp. 2d 647, 650–51 (E.D. Tex. 1999); **Washington (Count 38)**: *McCarthy Fin., Inc. v. Premera*, 182 Wash.2d 936, 942–944 (2015).

Thus, because Plaintiffs' allegations challenge *how* insurers calculated their rates and "seek a recalculation of the insurance rates that [their insurers] charged during the relevant period," Counts 7, 13, 21–26, 28, 29, 33, 35, 36, 38 should be dismissed. *Grossman*, 2022 WL 1656593, at *2; *Commw. Of Kentucky ex rel. Chandler,* 8 S.W.3d at 53 (dismissal of such claims shows proper deference to the "legislative polices [sic] embodied in the insurance code and the administrative apparatus called into being to carry out those policies").

## IV. Plaintiffs' State Law Claims Are Preempted by the FCRA.

Plaintiffs' state law claims are premised on allegations that Defendants collected and sold Plaintiffs' telematics and personal identifying information without notice or consent.[13] Because Plaintiffs allege that the Defendants took these actions for the purpose of underwriting insurance, Compl. ¶¶ 393, 520, this alleged conduct falls within the ambit of the FCRA's preemption clauses.

Federal law expressly preempts state law where the federal law explicitly "overrides state or local law." *Hoagland v. Town of Clear Lake*, 415 F.3d 693, 696 (7th Cir. 2005). Conflict preemption arises when a party cannot "comply with both local and federal requirements or where local law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)). Here, the FCRA preemption provisions are triggered by express and conflict preemption rules.

The FCRA was passed "to promote fair and accurate credit reporting," *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 418 (2021) (internal quotation marks omitted), "while recognizing

[13] Compl. ¶¶ 631, 683, 654 751, 946 (alleging under CA, FL, IL, and PA wiretapping and pen register laws that Defendants intercepted Plaintiffs' communications without Plaintiffs' consent); *id.* ¶¶ 535, 549, 558, 611, 909 (alleging the same under common law and California and Pennsylvania invasion of privacy, intrusion upon seclusion, and unjust enrichment); *id.* ¶¶ 570, 584, 661–62, 695, 705, 723, 760, 776, 794, 809, 823, 864, 878, 894, 931, 969, 986, 996, 1009 (alleging under 19 state consumer protection laws that failure to obtain consumer consent to obtain and report Plaintiffs' data was an unfair and deceptive practices); *id.* ¶¶ 834, 845 (alleging that Defendants violated New York's general business laws §§ 349 and 350 by obtaining, reporting, and using driving data without informed consent).

the legitimacy of credit reports as a necessary adjunct of commerce for consumer credit, personal matters, [and] insurance," *Thornton v. Equifax, Inc.*, 619 F.2d 700, 703 (8th Cir. 1980). In enacting the FCRA, Congress chose *not* to require consumer reporting agencies ("CRAs") to notify and obtain consumer consent before collecting and reporting information, but instead only require consent in limited scenarios inapplicable here.[14] *See Stergiopoulos & Ivelisse Castro v. First Midwest Bancorp, Inc.*, 427 F.3d 1043, 1046 (7th Cir. 2005) (FCRA "does not require that consumers expressly approve each request for a [consumer] report"). Neither does the FCRA require consent before sharing reports to third parties for a permissible purpose. *Hinton v. Trans Union, LLC*, 654 F. Supp. 2d 440, 449 (E.D. Va. 2009) ("consumer consent simply is not a prerequisite to release of a consumer report to a third party."), *aff'd*, 382 F. App'x 256 (4th Cir. 2010); *George v. Transunion Corp.*, No. 22-cv-4967, 2023 WL 5044956, at *4 (E.D. Pa. Aug. 8, 2023) (same). Insurance underwriting is a permissible purpose. *See* 15 U.S.C. § 1681b(a)(3)(C).

The FCRA, to carry out its intended purpose, includes broad preemption provisions "to avoid a patchwork framework of regulations on consumer reporting agencies and furnishers of information." *Fitzgerald v. Trans Union, LLC*, No. 17-cv-3842, 2018 WL 334530, at *4 n.3 (E.D. Pa. Jan. 8, 2018). Although the FCRA "does not annul, alter, affect, or exempt" state law regarding consumer reporting, state laws that are "inconsistent with any provisions of" the FCRA are preempted "to the extent of the inconsistency." 15 U.S.C. § 1681t(a).

Here, Plaintiffs allege that the Arity Defendants are CRAs and surmise that these Defendants are required to obtain their consent before collecting and sharing their data for

---

[14] *See*, *e.g.*, 15 U.S.C. §§ 1681b(b)(2) (requiring consumer consent to procure a consumer report for employment purposes), 1681b(c) (allowing prescreen solicitations only if the consumer consents or if the transaction consists of a firm offer of credit or insurance), 1681b(e)(1) (requiring CRAs to allow consumers to opt out of prescreened offers); 1681b(g)(1)(A) (requiring consumer affirmative consent to include medical information in a consumer report related to an insurance transaction).

insurance underwriting. Compl. ¶ 517.[15] Plaintiffs' allegations thus directly conflict with the FCRA's limited consent requirements, and are thus preempted. *See*, *e.g.*, *Knudson v. Wachovia Bank*, 513 F. Supp. 2d 1255, 1261 (M.D. Ala. 2007) (holding that because § 1681s-2(a) does not provide for a private cause of action, "[a]llowing a private right of action under state law for conduct regulated by § 1681s-2(a) is . . . inconsistent with the FCRA, and preempted under § 1681t(a)"); *Smith v. Equifax Info. Servs., LLC*, 522 F. Supp. 2d 822, 825 (E.D. Tex. 2007) (holding state law claim for injunctive relief against a CRA preempted by Section 1681t(a) because "Congress intended the power to obtain injunctive relief to lie solely with the FTC").

The FCRA also expressly preempts state laws that seek to regulate conduct with respect to responsibilities of *furnishers*, or entities that provide information to CRAs which CRAs use to create consumer reports, under Section 1681t(b)(1)(F). Thus, courts consistently have held that Section 1681t(b)(1)(F) preempts state common law or consumer protection claims that aim to regulate a furnisher's responsibilities. *See*, *e.g.*, *Howard v. Blue Ridge Bank*, 371 F. Supp. 2d 1139, 1144 (N.D. Cal. 2005) ("Congress intended the FCRA to preempt state laws regarding the duties of furnishers and the remedies available against them…"); *Jaramillo v. Experian Info. Sols., Inc.*, 155 F. Supp. 2d 356, 361–62 (E.D. Pa. 2001) ("[I]t is clear from the face of section 1681t(b)(1)(F) that Congress wanted to eliminate all state causes of action 'relating to the responsibilities of persons who furnish information to consumer reporting agencies'"); *Riley v. Gen. Motors Acceptance Corp.*, 226 F. Supp. 2d 1316, 1322 (S.D. Ala. 2002) (same); *cf. Purcell v. Bank of Am.*,

---

[15] Plaintiffs allege in conclusory fashion that all Arity Defendants are CRAs, but allege no facts to back that up (and in fact only Arity Services LLC is a registered CRA). Nonetheless, as alleged, Arity and Arity 875 could be "furnishers" of information under the FCRA. *See Westra v. Credit Control of Pinellas*, 409 F.2d 825, 827 (7th Cir. 2005) (explaining that entities that provide credit information to CRAs, like collections agencies, are furnishers under the FCRA). As detailed below, the FCRA's other preemption provision, 15 U.S.C. § 1681t(b)(1)(F), applies to furnishers of information and would similarly preempt Plaintiffs' state law claims against Defendants Arity and Arity, 875.

659 F. 3d 622, 623–26 (7th Cir. 2011) (broadly interpreting Section 1681t(b)'s preemptive force to apply to both state common law and state statutory claims).

Thus, the FCRA likewise preempts claims imposing notice and consent requirements on the Arity Defendants as alleged CRAs. Plaintiffs' allegations improperly presume a double standard where furnishers could provide information to the Arity Defendants without consumer consent, but then the Arity Defendants would be prohibited from reporting that information to third parties without consent. Because such allegations would impose notice and consent requirements that frustrate the FCRA's purpose, Plaintiffs' state common law and statutory claims are preempted. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (explaining that state laws impede federal law when "the purpose" of the federal law cannot "be accomplished").

## V. Plaintiffs' Federal and State Wiretapping Act Claims Should Be Dismissed.

### A. Plaintiffs' Federal Wiretap Act Claim (Count 1)

To state a claim under the Federal Wiretap Act ("FWA"), Compl. ¶ 482 (Count 1), Plaintiffs must plausibly plead that Defendants "(1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication (5) using a device." *In re Pharmatrak, Inc.*, 329 F.3d 9, 18 (1st Cir. 2003)). *See* 18 U.S.C §§ 2511(1)(a)–(b). Plaintiffs' FWA claim fails because their *own* allegations invoke the "party exception" to the FWA and they fail to plead the specific elements of their claim.

#### 1. The "Party Exception" Requires Dismissal Because Defendants Are a Party and Plaintiffs Consented to the Alleged Disclosure.

FWA liability does not apply when the alleged interceptor is "party" to the communication or where one of the parties to the communication gave "prior consent" to data interception. 18 U.S.C. § 2511(2)(d). This only requires *one* of the parties "to the communication to consent to an interception [by a third party]." *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1028 (N.D. Cal. 2014).

This exception has been enforced repeatedly at the dismissal stage in similar data privacy cases involving purported third-party disclosures on mobile apps and websites. *See*, *e.g.*, *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 140–42 (3d Cir. 2015) (applying party exception where browsers sent the relevant communication "directly to the defendants' servers"); *Kurowki*, 659 F. Supp. 3d at, 934, 938 (applying exception to website that transmitted data to third-party advertisers because the website was the intended recipient). Although there is a limited carveout to this exception for communications intercepted "for the purpose of committing any criminal or tortious act," 18 U.S.C. § 2511(2)(d), it applies only where "the *primary motivation* or a determining factor in the interceptor's actions has [to be] to injure plaintiffs tortiously." *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 945 (N.D. Cal. 2023) (emphasis added) (dismissing FWA claim). Courts have refused to enforce the carveout where the allegations suggest that the defendants' motivation was to profit, rather than to commit some independent crime or tort. *See*, *e.g.*, *Rodriguez v. Google LLC*, No. 20-cv-04688, 2021 WL 2026726, at *6 n.8 (N.D. Cal. May 21, 2021) (exception inapplicable where Google's alleged interceptions were financially motivated).

Here, Plaintiffs allege they were voluntary parties to communications with the third-party Apps. *E.g.*, Compl. ¶ 402 (alleging that the Apps "require consumers to communicate location data for the app to function as intended."). Likewise, Plaintiffs allege the third-party Apps purposely integrated Defendants' SDK and, therefore, consented to the disclosures via that SDK. *Id.* ¶¶ 402–03, 405 (alleging that App developers "integrated their SDK into . . . their own applications (such as Drivewise)").

Because Plaintiffs allege that the Apps consented to the purported disclosures via their integration of the SDK, the party exception to the FWA bars their claims. *See Kurowki*, 659 F.

Supp. 3d at 938.[16] Plaintiffs fail to plead any allegations invoking the crime-tort carveout, as their "recitation of the elements that the [d]efendant's purpose was tortious or criminal, without alleging any facts—independent of the interception itself—that it was done for a criminal or tortious purpose, will not do." *Doe 1 v. Chestnut Health Sys., Inc.*, No. 1:24-cv-01475-JEH-RLH, 2025 WL 1616635, at *12 (C.D. Ill. June 6, 2025) (citing *Iqbal,* 556 U.S. at 678). To the contrary, the Complaint alleges that Defendants took action "for their own purposes (including to calculate insurance rates for Plaintiffs) or sold the data to third parties for profit." Compl. ¶¶ 1, 9. If the Court takes Plaintiffs at their word, as it must, then the Complaint alleges that Defendants did what they did for business purposes, *i.e.*, *to make money*. *Rodriguez*, 2021 WL 2026726, at *6 n.8; *In re Google Inc. Gmail Litig.*, No. 13-md-02430, 2014 WL 1102660, at *18 n.13 (N.D. Cal. Mar. 18, 2014) ("[T]he tort or crime exception cannot apply where the interceptor's 'purpose has plainly not been to perpetuate torts on millions of Internet users, but to make money.'").

**2. Alternatively, the FWA Count Must Be Dismissed Because Plaintiff Fails to Plead the Elements of the FWA.**

Plaintiffs' FWA claim should be dismissed for three other, independent reasons. *First*, by statute, the FWA *excludes* from the definition of electronic communication, "any communication from a tracking device," 18 U.S.C. § 2510(12)(C), defined as "an electronic or mechanical device which permits the tracking of the movement of a person or object," 18 U.S.C. § 3117(b). The Apps built with the Arity SDK—coupled with the hardware capabilities of the smartphones in which they are installed—render Plaintiffs' phones "tracking devices." *See*, *e.g.*, *In re Application for*

[16] Plaintiffs' other theory under the FWA fails for similar reasons. To be liable under Sections 2511(1)(c) & (1)(d), "a defendant must know or have reason to know sufficient facts concerning the circumstances of the interception such that the defendants could . . . determine the interception was prohibited" by the FWA and that "none of the statutory exceptions appl[ied]." *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 753 (7th Cir. 2010) (citation modified). Because Defendants are a party to the communication, they would have no reason to know that the party exception to the FWA does not apply to them.

*Pen Register & Trap/Trace Device with Cell Site Location Auth.*, 396 F. Supp. 2d 747, 759 (S.D. Tex. 2005) ("Real-time location monitoring effectively converts a cell phone into a tracking device," bringing it outside the scope of the FWA). Plaintiffs themselves allege that "movement" and location data are allegedly collected by the Arity SDK. *See* Compl. ¶ 410 (movement and location data is collected by Plaintiffs' cellphones); 18 U.S.C. § 3117(b) (excluding devices that track "the movement of person or object"). The conduct thus is excluded by the FWA.

*Second*, Plaintiffs fail to allege that the data purportedly intercepted constitutes "content," *i.e.*, "information concerning the substance, purport, or meaning" of a communication. 18 U.S.C. § 2510(8). "Congress intended the word 'contents' to mean a person's intended message to another, i.e., the 'essential part' of the communication, the 'meaning conveyed,' and the 'thing one intends to convey.'" *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014) (citation modified); *see also In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1061 (N.D. Cal. 2012) ("'[C]ontent' is limited to information that the user intended to communicate, such as the words spoken in a phone call."); *United States v. Reed*, 575, F.3d 900, 917 (9th Cir. 2009) (data collected by a telephone company about the source, destination, and duration of a call is not "content"). Neither Plaintiffs' driving behavior data nor their personal identifying data—which they allege Defendants "surreptitiously" collected, *see*, *e.g.*, Compl. ¶¶ 475, 535—is "content" under the FWA. For example, Plaintiffs do not plead that they *intended* to communicate a substantive message to anyone, and instead allege that Defendants collected data without their knowledge. *See*, *e.g.*, *id.* ¶ 1. That allegation—which effectively states that Plaintiffs did not know they were making a communication—takes the underlying data entirely out of the statutory definition of "content." *See Vasil v. Kiip, Inc.*, 16-cv-09937, 2018 WL 1156328, at *3 (N.D. Ill. Mar. 5, 2018)

(no "content" under the FWA where plaintiffs consistently pled that they "never consented to the communication of their location data or device identifiers while they were not using their phones").

Further, metadata or record information about a communication that is "generated automatically" by the operation of the Apps is not a message intentionally "conveyed" by a user, and therefore cannot be "content." *See*, *e.g.*, *In re iPhone Application Litig.*, 844 F. Supp. 2d at 1061 (holding geolocation data is not "content" under FWA because it is "generated automatically, rather than through the intent of the user"); *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1082 (N.D. Cal. 2015) (same); *Vasil*, 2018 WL 1156328, at *4 (same for other device information). The same is true for the personal identifying data allegedly generated automatically when Plaintiffs used the Apps. *See*, *e.g.*, Compl. ¶¶ 8, 421 (describing types of personal identifying data). In 1968, Congress amended the FWA's definition of "contents" to eliminate "the identity of parties to such communication." *See* Pub. L. No. 99-508 § 101(a)(5). Identifying information is now considered "record information regarding the characteristics of the message" as "is generated in the course of the communication"—not substantive "content." *In re Zynga Priv. Litig.*, 750 F.3d at 1106. *See also Gilday v. Dubois*, 124 F.3d 277, 296 n.27 (1st Cir. 1997) (record information about a call did not capture the "contents"); *Reed*, 575, F.3d at 917 (same). The various personal identifying information identified in the Complaint thus cannot form a basis for the FWA claim.[17]

*Third*, Plaintiffs fail to plead allegations showing that the contents of their communications were 'intercepted" contemporaneously during their "transmission." *Peters v. Mundelein Consol. High Sch. Dist. No. 120*, No. 21-cv-0336, 2022 WL 393572, at *11 (N.D. Ill. Feb. 9, 2022) (quoting

[17] Although a narrow exception exists when personal identifying information is itself the subject of the communication, that exception does not apply. *See In re Pharmatrak*, 329 F.3d at 15–16, 18–19 (treating interception of information disclosed in a website sign-up form, *e.g.*, names, address, phone numbers, email, as "content" because that information was the subject of communication to the website administrator). No Plaintiff alleged they intended to convey a message to the Apps or Arity SDK.

*Boudreau v. Lussier*, 901 F.3d 65, 77 (1st Cir. 2018)). Plaintiffs' own allegations state that the Arity SDK was integrated directly into the Apps as a "plug-in." *See* Compl. ¶¶ 404–05. Under this allegation, the Arity SDK is inherent to the App and collects data in real time, and not by *intercepting* any information. *See* Compl. ¶ 404 n.21 (explaining that an SDK is part of a mobile app). Defendants cannot intercept communications to themselves. *See Crowley v. CyberSource Corp.*, 166 F.2d 1263, 1271–72 (N.D. Cal 2001) (holding no interception of consumer data by Amazon when plaintiff put his personal information into Amazon's website, and only after did Amazon send data to third-party). Likewise, Plaintiffs' allegations that this purported interception happens entirely within a self-contained app shows that "the system through which [the data] traveled did not affect interstate . . . commerce," and thus is not an interception. *Rene v. G.F. Fishers, Inc.*, 817 F. Supp. 2d 1090, 1094 (S.D. Ind. 2011) ("[C]ontemporaneous interception must occur while the transmission is traveling through a system that affects interstate or foreign commerce.") Alternatively, to the extent Plaintiffs intend to allege that the Arity SDK within the App receives the purportedly disclosed information and then separately discloses it to Defendants, that is not a "contemporaneous" interception under the FWA. 18 U.S.C. § 2510(4).

**B. Plaintiffs' Claims Under Analogous State Wiretapping Statutes Should Be Dismissed for the Same Reasons as the FWA Claim (Counts 11, 14, 19, 34).**

Plaintiffs' claims under the wiretapping statutes of California, Florida, Illinois, and Pennsylvania[18] likewise should be dismissed for the same reasons as the Federal Wiretap Act: failure to allege the "contents" of their "communications" were "intercepted." These wiretapping statutes largely track the FWA. *See Brodsky v. Apple, Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal.

[18] Count 11 (California Invasion of Privacy Act, Cal. Penal Code § 630); Count 14 (Florida Security of Communications Act, Fla. Stat. § 934.01); Count 19 (Illinois Wiretapping Law, 720 Ill. Comp. Stat. Ann. 5/14-1); Count 34: (Pennsylvania Wiretapping and Electronic Surveillance Act, 18 Pa. Cons. Stat. Ann. § 5703).

Apr. 7, 2020) ("The analysis for a violation of CIPA is the same as that under the federal Wiretap Act.") (quoting *Cline v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1051 (N.D. Cal. 2018); *Minotty v. Baudo*, 42 So. 3d 824, 831 (Fla. Dist. Ct. App. 2010) (same, for Florida); *People v. Ledesma*, 795 N.E.2d 253, 258–60 (Ill. 2003) (same, for Illinois), *overruled on other grounds*, *sub nom*. *People v. Pitman*, 813 N.E.2d 93 (Ill. 2004); *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 125–26 (3d Cir. 2022) (same, for Pennsylvania). Thus, any basis sufficient to dismiss the FWA claim will warrant dismissal of the state claims. Indeed, some states have directly adopted the FWA's definitions of "content," "communication," and "intercept."[19] Further, the FWA's "party exception" operates similarly under California and Illinois law. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020) (party exception recognized under CIPA);[20] *Stein v. Edward-Elmhurst Health*, No. 23-cv-14515, 2025 WL 580556, at *8 (N.D. Ill. Feb. 21, 2025) (dismissing Illinois wiretap act claim on the basis of party exception). Therefore, to the extent Plaintiffs allege data was sent directly to Defendants, the party exception applies.

---

[19] *See*, *e.g.*, *See Graham v. Noom, Inc.*, 533 F. Supp. 3d 823, 833 (N.D. Cal. 2021) (citing *In re Zynga Priv. Litig.*, 750 F.3d at 1106) (CIPA defines "content" same as FWA); *Goldstein v. Costco Wholesale Corp.*, 559 F. Supp. 3d 1318, 1321 (S.D. Fla. 2021) (same under Fla. wiretapping law); *Cook*, 689 F. Supp. 3d at 68–69 (same under Pa. wiretap statute); *In re TikTok, Inc. In-App Browser Litig.*, No. 24 C 2110, 2024 WL 4367849, at *14–15 (N.D. Ill. Oct. 1, 2024) (same under Ill. Eavesdropping Act); *Gruber v. Yelp Inc.*, 55 Cal. App. 5th 591, 607 (5th Dist. 2020) (explaining the term "communication" for purposes of CIPA "connotes a singular conversation or exchange shared between two or more participants.");18 Pa. Cons. Stat. Ann. § 5702 (defining "intercept" in the same way as the FWA).

[20] *See Cole v. Quest Diagnostics, Inc.*, No. 2:23-cv-20647-WJM, 2025 WL 88703, *2 (D.N.J. Jan. 14, 2025) (dismissing CIPA claim where "browsers were communicating *directly* with the alleged eavesdropper because the users' browsers were sending [] requests directly to [third party's] servers") (emphasis added), *appeal docketed*, No. 25-1219 (3d. Cir. Feb. 13, 2025), No. 25-1449 (3d. Cir. Mar. 13, 2025); *Roe v. Amgen Inc.*, No. 2:23-cv-07448-MCS-SSC, 2024 WL 2873482, at *6 (C.D. Cal. June 5, 2024) (dismissing CIPA claim for failure to plead that the third party was not a "party to [a] communication"), *reconsideration denied*, 2024 WL 3811251 (C.D. Cal. Aug. 13, 2024).

### C. Plaintiffs' California Pen Register Claim Should Be Dismissed (Count 12).

Plaintiffs allege that Defendants' SDK is an unlawful pen register or trap and trace device placed on cell phones without obtaining a court order, in violation of California law. This law prohibits the capture of "dialing, routing, addressing, or signaling information" from a "wire or electronic communication," "but not the contents of a communication." Cal. Penal Code §§ 638.50(b)–(c); 638.51. And consent to capturing this information is an absolute defense. Cal. Penal Code § 638.51(b)(5). Plaintiffs allege they reviewed the App Agreements applicable to the Apps they downloaded, and those agreements (to which Plaintiffs assented) outlined the information the apps intended to collect. *See supra*, Section II.C. Plaintiffs were notified in advance—and agreed—to that collection, and thus Count 12 must be dismissed. *Cf. Rodriguez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921, 929–30 (C.D. Cal. 2025) (sustaining section 638.51 claim where plaintiff alleged the software collecting information was installed *before* having any opportunity to consent).

## VI. Plaintiffs' Remaining Counts Should be Dismissed for Failure to State a Claim.

### A. Plaintiffs' Computer Hacking Claims Should be Dismissed (Counts 2, 9, 32).

Plaintiffs allege violations of the Computer Fraud and Abuse Act ("CFAA") 18 U.S.C. § 1030 (Count 2), the California Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502 (Count 9), and Pennsylvania's Unlawful Use of Computer statute, 18 Pa. Cons. Stat. Ann. § 7611 (Count 32). But these computer or device "hacking" statutes have no bearing here.

#### 1. Plaintiffs Fail to Allege Defendants Intentionally Accessed Their Device or Computer Without Authorization.

A violation of the CFAA "occurs when an individual 'intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer[.]'" 18 U.S.C. § 1030(a)(2)(C). Access "without authorization" occurs "only

where initial access is not permitted." *Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1343 (N.D. Ga. 2007). To allege a defended "exceeded" authorized access, a plaintiff must factually allege that the defendant used its "access to obtain or alter information in the computer that [it] is not entitled to obtain or alter." *Motorola, Inc. v. Lemko Corp.*, 609 F. Supp. 2d 760, 767 (N.D. Ill. 2009) (quoting 18 U.S.C. § 1030(e)(6)); *see also Van Buren v. United States*, 593 U.S. 374, 396 (2021) (providing example where defendant "obtains information located in particular areas of the computer—such as files, folders, or databases—that are off limits"). The California and Pennsylvania hacking statutes largely follow the CFAA. CDAFA claims generally "rise or fall" with CFAA claims. *Brodsky*, 445 F. Supp. 3d at 131 (dismissing CDAFA claims with prejudice). Likewise, under the Pennsylvania statute, a user "exceeds authorization" only when they go "beyond the limit of their official permission" by "surpassing limitations on permitted purposes for retrieving data." *Commonwealth v. Derr*, 293 A.3d 671, 680 (Pa. Super. Ct. 2023), *appeal denied*, 308 A.3d 766 (Pa. Nov. 28, 2023).

Here, Plaintiffs fail to allege a lack of authorization against Defendants. Plaintiffs allege exactly the opposite, pleading that they voluntarily downloaded the Apps onto their phones, accepted the Apps' terms and privacy policies, and granted the permissions necessary to use the Apps. *See, supra,* Section II.A–C. Their own allegations thus make clear that Defendants "had authority to access the[ir] [devices] and to collect geolocation [and other] data as a result of the voluntary installation of the software." *In re iPhone Application Litig.*, 844 F. Supp. 2d at 1066 *Abu v. Dickson*, 107 F.4th 508, 515 (6th Cir. 2024) (when "computer code allows a user to take a certain action, it's usually fair to say that the system authorizes the access"). And there are no allegations that access was exceeded—instead, the SDKs allegedly were doing exactly what they said they would do. And while the Pennsylvania statute considers a user's "purpose" when

evaluating whether the scope of authorization was exceeded, *see Derr*, 293 A.3d at 680, no Plaintiff alleges the SDKs accessed and collected data for any purpose other than the one disclosed in the various agreements. Thus, there is no basis to infer that Defendants' access to Plaintiffs' data was unauthorized.

**2. Plaintiffs Fail to Allege Harm Under the CFAA and CDAFA.**

Plaintiffs separately fail to allege "damage" or "loss" under the CFAA and CDAFA. "Damage" means "any impairment to the integrity or availability of data, a program, a system, or information," while "loss" relates to costs caused by harm to computer data [or] programs." *Van Buren*, 593 U.S. at 391–92 (citing 18 U.S.C. §§ 1030(e)(8), (11)) (citations omitted). The focus is on actual "technological harms—such as the corruption of files," and not mere "'misuse' of sensitive information[.]" *Id*. at 392; *accord Andrews v. Sirius XM Radio Inc*., 932 F.3d 1253, 1263 (9th Cir. 2019) (CFAA "focus[es on] harms caused by computer intrusions, not general injuries unrelated to the hacking itself."). The CDAFA tracks the CFAA's scope of harms. *See Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 895 (N.D. Cal. 2010) ("the necessary elements of [CDAFA] do not differ materially from the necessary elements of the CFAA" with respect to damage and loss).

Here, none of Plaintiffs' theories of factual harm—insurance-related injury, privacy harms, or unjust enrichment—is recognized under the CFAA's (and by extension, the CDAFA's) remedial scope. They neither allege any impairment in the integrity of their data or devices, *see id.*, nor allege any monetary costs "responding to a violation" or consequential damages "because of interruption of service." *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1174 (11th Cir. 2017). Their purported injuries relating to the misuse of information are not cognizable under the CFAA or CDAFA. *See Andrews*, 932 F.3d at 1263; *In re iPhone Application Litig.*, 844 F. Supp.

2d at 1068 ("courts have tended to reject the contention that personal information—such as the information collected by the [Defendants]—constitutes economic damages under the CFAA").

### B. Plaintiffs Fail to State a Claim Under the FCRA (Count 3).

Plaintiffs allege that Arity Defendants "knowingly and willfully engaged in the collection and production of inaccurate data metrics" regarding their "driving abilities" and shared that data with auto insurers, resulting in inflated insurance premiums.[21] Compl. ¶¶ 520, 524, 526. Plaintiffs assert that Defendants committed "reckless and/or negligent" violations of the FCRA, 15 U.S.C. § 1681e(b). Compl. ¶ 526. This theory of liability has no basis in law.

To state a claim under the FCRA, a party must allege that (1) inaccurate information was reported to their credit files; (2) the inaccuracy was caused by a defendant's "failure to follow reasonable procedures to assure maximum possible accuracy"; (3) the party suffered actual damages; and (4) the inaccurate information caused those damages. *Benson v. Trans Union, LLC*, 387 F. Supp. 2d 834, 840 (N.D. Ill. 2005) (citing 15 U.S.C. § 1681e(b)). A plaintiff that establishes all four factors is only entitled to "actual damages" unless they also can prove the defendant "willfully" (and not just negligently) failed to comply with the FCRA. *Persinger v. Sw. Credit Sys.*, L.P., 20 F.4th 1184, 1194–95 (7th Cir. 2021). The FCRA claim fails.[22]

[21] Just as Plaintiffs concede that they consented to use of their data by Defendant owned-insurance apps, therefore limiting their allegations about lack of consent to the third-party Apps, *see, supra*, Section II, here Plaintiffs implicitly concede that their FCRA claim is limited to third-party Apps. *See* Compl. ¶ 521 (alleging that as part of FCRA claim, the Arity Defendants' provision of "driving behavior data to third parties," constitutes "the furnishing of consumer reports under the FCRA"). *See also supra,* n. 9.

[22] The FCRA claims separately should be dismissed because the underlying activity—furnishing driving data information to automobile insurers for purposes of insurance underwriting—is specifically a "permissible purpose" under the Act. 15 U.S.C. § 1681b(a)(3)(C). Thus, Plaintiffs' allegation that Defendants' provision of "driver behavior data to third parties, including automobile insurance companies" is an "impermissible purpose and use of data under the FCRA," Compl. ¶ 521, is flatly at odds with what Congress has determined to be a permissible purpose under the statute.

**1. Plaintiffs Fail to Identify Any Inaccuracy in their Files.**

The threshold requirement for all FRCA claims is the existence of an "inaccuracy in the consumer's credit report." *Chuluunbat v. Experian Info. Sols., Inc.*, 4 F.4th 562, 567 (7th Cir. 2021). A credit report is inaccurate if it is "factually inaccurate," *id.*, or "omits accurate information that could reasonably be expected to adversely affect a consumer's creditworthiness." *Chaitoff v. Experian Info. Sols., Inc.*, 79 F. 4th 800, 812 (7th Cir. 2023). Here, Plaintiffs allege—in the most conclusory terms—that Defendants "engaged in the collection and production of inaccurate data metrics" regarding Plaintiffs' "driving abilities," for example, by (1) "misreport[ing] Driver Data as being associated with one individual, when that information should be associated with other individuals," (2) "provid[ing] no context for certain Driver data," or (3) continuing to report such data even though the "systems" that collect it are "prone" to errors. Compl. ¶ 524(a)–(b). Every Plaintiff also alleges they "rode as a passenger numerous times" while carrying their phones, such that "any assumption that the movement of [Plaintiff's] phone during those trips reflected [Plaintiff's] driving was inaccurate." *E.g.*, *id.* ¶¶ 21, 30, 39, 48, 58, 67, 94. "[A]ny insurance premiums based on this analysis," Plaintiffs further allege, "*would* necessarily be inflated." *See*, *e.g.*, *id.* ¶ 21, 30, 39, 48, 58, 67, 76 (emphasis added). Completely absent from Plaintiffs' copy-and-paste "facts" are any allegations that another person's data *actually* was misattributed to them.

In fact, the Complaint lacks even a modicum of specificity about the "dates of occurrence or descriptions of what [they] found inaccurate about [their] report[s]." *Saho v. Equifax, Inc.*, No. 1:19-cv-04252-LMM-RGV, 2019 WL 11499337, at *5 (N.D. Ga. Oct. 31, 2019). Nowhere do Plaintiffs allege any facts that the data reported by Defendants was *in fact* inaccurate—they simply conclude that the system is "prone to errors," and that, if another person's data *were* misattributed

to them, then that misattribution *would* be inaccurate.[23] Merely alleging that Defendants "prepared and issued inaccurate" data is not enough to state an FCRA claim. *See Allison v. ChexSystems Collection Agency, Inc.*, No. 23-cv-1132, 2023 WL 3200254, at *2 (N.D. Ill. May 2, 2023) (dismissing FCRA claim: "bare assertion" that "credit report was inaccurate—without further factual support—does not support a plausible claim."). Given the lack of allegations on specific inaccuracies, Plaintiffs cannot make the FCRA's threshold showing.

Plaintiffs' allegation that their driving data is collected and (potentially) shared with no "context" likewise fails to "nudge[] their claims across the line from conceivable to plausible." *E.g.*, Compl. ¶¶ 21, 30, 39, 48, 58, 67, 76, 85, 94; *Twombly*, 550 U.S. at 570. Plaintiffs seem to imply that "uncontextualized" driving data misleads auto insurance underwriters. But apart from hypothesizing that "insurance premiums based on this analysis *would* necessarily be inflated," *E.g.*, Compl. ¶¶ 21, 30, 39, 48, 58, 67, 76, 85, 94 (emphasis added), Plaintiffs provide no facts that the driving data transmitted by the Arity Defendants *actually impacted* their auto insurance rates.[24] As described in Section III.B, their claims would be barred by the Filed-Rate Doctrine in any event.

---

[23] Twice, Plaintiffs reference the fact that a person's driving score was lowered because an auto insurance provider assumed that data collected from his phone was related to his driving behavior when he was riding a roller coaster. *See*, *e.g.*, Compl. ¶¶ 11, 437. Yet, they do not allege that he is a plaintiff in this action, and review of the article cited demonstrates that he was a subscriber to Geico, not Defendants. *See* Compl. ¶ 437, n.48 (citing Chad Murphy, "Sir, this is a roller coaster. Car insurance dings driving score for man riding The Beast." The Cincinnati Enquirer (October 8, 2024), https://www.cincinnati.com/story/entertainment/2024/10/08/insurance-cuts-driving-score-man-riding-the-beast-kings-island/75554987007).

[24] Remarkably, even if credited, Plaintiffs' theory would imply that they should be legally insulated from insurance pricing models that reflect their actual driving behavior—an approach that runs counter to the risk-based frameworks long endorsed by regulators. Courts consistently uphold the use of individualized data, including mileage and driving patterns, in assessing insurance risk. Plaintiffs' effort to obscure, misrepresent, or decouple those inputs from pricing does not advance consumer protection; it undermines the very principles of actuarial fairness and transparency that ensure all drivers are treated equitably.

**2. Plaintiffs Fail to Allege Harm Caused by What Defendants Reported.**

The FCRA claim also fails because Plaintiffs do not plead that they were injured *as a result* of any alleged inaccuracies. Plaintiffs plead only that "*any* insurance premiums based" on the driving data collected by the Arity Defendants "would necessarily be inflated." *See generally* Compl. ¶¶ 17–376 (emphasis added). But this would-be-could-be pleading does not allege that *their* insurance premiums in fact were inflated as a result of any shared data. Under the FCRA, "a consumer is not injured by an inaccurate credit report unless that false information is communicated to *and acted upon* by a third-party user." *Renninger v. ChexSystems*, No. 98-cv-669, 1998 WL 295497, at *6 (N.D. Ill. May 22, 1998) (emphasis added) (dismissing FCRA claim).

Here, there is no basis to infer any third-party user of the date "acted upon" anything. *Id*. All Plaintiffs offer are hypotheticals that an insurer *could* use the data—and that, if they did, the resulting insurance rate *would* be inaccurate. That speculation does not satisfy the FCRA's "actual damages" requirement. *See Librizzi v. Ocwen Loan Servicing, LLC*, 120 F. Supp. 3d 1368, 1375 (S.D. Fla. 2015) (dismissing FCRA claim where plaintiff did not allege "that he was denied credit because of inaccuracies in his credit report produced by" defendants). Nor do Plaintiffs allege the required "causal relation between the violation of the statute and the loss of credit, or some other harm[.]" *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001) (holding a plaintiff must show the adverse action was taken "because of the" inaccuracy). Insurance rates fluctuate for a variety of reasons, and Plaintiffs make no effort to disaggregate those reasons and isolate "inaccurate driving data" as the cause of any increased insurance premiums they "would" pay.

**3. Plaintiffs Fail to Plead Actual Damages Under the FCRA.**

Unless Plaintiffs can show that Defendants *willfully* failed to comply with the FCRA, they are only entitled to "actual damages." 15 U.S.C. § 1681n(a). And because Plaintiffs fail to allege any actual damages caused by Defendant's conduct, they will be entitled to nothing.

Nor can Plaintiffs access the statutory or punitive damages that the FCRA reserves for willful (*i.e.*, knowing or reckless) violations. The Supreme Court holds that a defendant "does not act in reckless disregard" of the FCRA unless (1) the action is "a violation under a reasonable reading of the statute's terms," and (2) the plaintiff "shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 50 (2007). Simply stating that a defendant acted "willfully," without more, is insufficient to access special damages under Section 1681n(a). *Lewis v. Experian Info. Sols., Inc.*, No. 23-cv-857, 2024 WL 1308705, at *9 (E.D.N.Y. Mar. 27, 2024).

Plaintiffs' attempt to plead willfulness fall short: they point out that Defendants admit that collecting driver trip data through smartphones is an "imperfect method" and that Drivewise "allows program users to edit recorded [sic] trips to correct mistakes before they are considered for any rate or discount decision." Compl. ¶ 426. Yet, Plaintiffs do not allege that Defendants *knew* they were reporting inaccurate information as to *Plaintiffs* specifically—and worse, Plaintiffs' allegation that Drivewise allowed users to correct mistakes undermines any such inference of willful inaccurate reporting. All Plaintiffs point to is Defendants' generalized awareness that mistakes might happen, but that is not enough. *See Young v. Experian Info. Sols., Inc.*, No. 3:22-cv-50222, 2025 WL 964877, at *14 (N.D. Ill. Mar. 31, 2025) (finding no willfulness absent evidence Experian knew the reported deceased status was incorrect beyond plaintiff's general dispute of the accuracy). Thus, Plaintiffs can access, at most, actual damages—that is, *nothing*.

### C. Plaintiffs' Statutory State Consumer Protection Claims Must be Dismissed.

#### 1. Under Six Separate State Statutes, Plaintiffs Fail to Adequately Allege They Complied with the Mandated Pre-Suit Requirements.

Plaintiffs' state law claims under six separate unfair, deceptive, and abusive consumer practices statutes ("UDAP" statutes) are subject to mandatory dismissal for failure to adequately

allege compliance with pre-suit requirements. Alabama, Indiana, Texas, and Utah require formal notice before filing suit under their respective statutes. *See* Ala. Code § 8-19-10(e) (requiring 15-day notice via written demand); *Holmes v. Behr Process Corp.*, No. 2:15-cv-0454-WMA, 2015 WL 7252662, at *2 n.2 (N.D. Ala. Nov. 17, 2015) (a pre-suit demand is "a condition precedent to filing a suit"); Ind. Code § 24-5-0.5-5 (requiring pre-suit notice); *Castagna v. Newmar Corp.*, No. 3:15-cv-249-TLS, 2016 WL 3413770, at *9 (N.D. Ind. June 22, 2016) (same); Tex. Bus. & Com. Code § 17.505(a) (same); *Charger Servs., LLC v. Togs USA, Inc.*, No. MO:19-cv-00058-DC, 2019 WL 11519056, at *1 (W.D. Tex. Apr. 10, 2019) (same); Utah Code Ann. 1953 § 13-11a-4 (same); *Proctor & Gamble Co. v. Haugen*, 947 F. Supp. 1551, 1555 (D. Utah 1996) (same).

None of the Plaintiffs asserting claims under Alabama, Indiana, Texas, or Utah law has alleged proper compliance with pre-suit notice requirements. Although the Alabama Plaintiff and the Indiana Plaintiff allege in conclusory terms that notice was provided, they fail to plead anything about this purported notice, such as when or to whom it was sent. Compl. ¶¶ 567 (Ala.), 769 (Ind.). The Texas and Utah Plaintiffs entirely fail to plead that proper pre-suit notice was provided. *See* Compl. ¶¶ 976–90 (Tex.); 991-1004 (Utah). Thus, Counts 7, 20, 36, and 37 should be dismissed.

Plaintiffs also ignore Mississippi and Ohio's onerous pre-suit requirements. To proceed on a class basis, the Ohio Consumer Sales Practices Act ("OCSPA") requires plaintiffs to show that either the Ohio Attorney General or a court already has determined that the seller's practice is deceptive or unconscionable. Ohio Rev. C. Ann. § 1345.09(B); *Robins v. Glob. Fitness Holdings, LLC*, 838 F. Supp. 2d 631, 648 (N.D. Ohio 2012). Under Mississippi law a plaintiff in "any private action" must first attempt to resolve a claim through a program approved by the Attorney General. Miss. C. Ann. § 75–24–15(2). Counts 22 (Mississippi) and 29 (Ohio) fail to allege compliance with these requirements and should be dismissed. *Gerboc v. ContextLogic, Inc.*, 867 F.3d 675, 680

(6th Cir. 2017) (citing Ohio Rev. C. Ann. § 1345.09(B)); *Raymond v. Avectus Healthcare Sols., LLC*, No. 1:15-cv-559, 2020 WL 3470461, at *9 (S.D. Ohio Mar. 27, 2020) (dismissing claim for lack of pre-suit notice); *Lockey v. CMRE Fin. Servs., Inc.*, No. 1:11-cv-70, 2011 WL 2971085, at *2 (S.D. Miss. July 20, 2011) (compliance with statute is "a prerequisite to bringing suit").

### 2. Plaintiffs Fail to Allege Actual Harms Sufficient to State Claims Under Fifteen of the State UDAP Statutes Asserted.

Plaintiffs' claims under the fifteen state consumer protection statutes (Counts 7, 8, 13, 15, 16, 18, 21, 22, 25, 26, 29, 30, 33, 35, 37) must be dismissed because they fail to allege *actual damages*—a threshold requirement under each law to show concrete, non-speculative injury reflecting measurable loss, typically economic in nature. Courts repeatedly reject claims premised on abstract harms like emotional distress or diminution in value of data. *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 739 (7th Cir. 2014) (Illinois) ("actual pecuniary loss" required); *Dorestin v. Hollywood Imports, Inc.*, 45 So. 3d 819, 824–25 (Fla. Dist. Ct. App. 2010) (same for Florida); *Gerboc*, 867 F.3d at 680 (Ohio) (same); *Madkin v. Automation Pers. Servs., Inc.*, No. 2:21-cv-1177, 2023 WL 12036560, at *5 (N.D. Ala. Apr. 17, 2023) (Alabama private right of action limited to "monetary damage to a consumer"); *Standfacts Credit Servs. v. Experian Info. Sols., Inc.*, No. CV04-0358, 2006 WL 4941834, at *2 (C.D. Cal. Oct. 12, 2006) (California) ("[A]n action for relief" under California statute requires, in addition to injury-in-fact, the loss of "money or property"). The nine other states are in accord.[25]

[25] **Arizona**: *Holeman v. Neils*, 803 F. Supp. 237, 242 (D. Ariz. 1992) ("A private individual's relief under the Consumer Protection Act is his actual damages suffered as a result of the unlawful act or practice."); **Kentucky**: *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 728 (Ky. Ct. App. 2007) ("ascertainable loss of money or property" required); **Mississippi**: *Lockey,* 2011 WL 2971085, at *2 (same as Ky.); **New York**: *Han v. Hertz Corp.*, 784 N.Y.S.2d 106, 108 (1st Dep't 2004) (N.Y. Gen. Bus. Law § 349) ("actual—albeit not necessarily pecuniary—harm is required to impose compensatory damages"); **Ohio:** *Gerboc*, 867 F.3d at 680 (class claimants must "'allege and prove'" they suffered "'actual damages' proximately caused by the defendant's deceptive practice."); **Oregon**: *Pearson v. Philip Morris, Inc.*, 361

Here, Plaintiffs allege a range of intangible harms, ranging from loss of control over personal data, emotional harm, and anxiety about potential misuse. *See*, *e.g.*, Compl. ¶¶ 1–3, 21, 24, 33, 40, 43, 49, 52, 466, 541, 837, 858. But *none* of these allegations pleads actual damages. Loss of data control or theoretical diminishment in data value, without more, do not plead a personal economic loss. *See In re Facebook Privacy Litig*., 572 F. App'x 494, 494 (9th Cir. 2014) (affirming dismissal of UCL claim where disclosed data had no independent economic value to users); *Hart v. TWC Prod. & Tech. LLC*, 526 F. Supp. 3d 592, 603 (N.D. Cal. 2021) (same); *Gorgas v. Amazon.com, Inc.*, No. 22-cv-5159, 2023 WL 4173051, at *3 (N.D. Ill. June 23, 2023) (same); *Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 849 (N.D. Cal. 2014) (loss of data control does not show actual damages); *Svenson v. Google Inc*., 65 F. Supp. 3d 717, 730 (N.D. Cal. 2014) (same for money paid to purchase app). Nor does it matter that Defendants allegedly profited: unjust enrichment-style theories, where the harm is measured by a *defendant's* gain, do not establish actual damages to *plaintiffs*. *See, e.g.*, *Greenley v. Kochava, Inc*., 684 F. Supp. 3d 1024, 1054 (S.D. Cal. 2023) ("Courts have consistently found that alleging the economic value of data is not enough, if a plaintiff fails to allege the economic value to *him*."); *Ramirez v. LexisNexis Risk Sols*., 729 F. Supp. 3d 838, 850 (N.D. Ill. 2024) (lost value of personal data is not "lost money").

Plaintiffs' alternative theory—that they suffered financial harm through inflated insurance premiums as a result of undisclosed data collection, *see*, *e.g.*, Compl. ¶¶ 21, 30, 39, 48—fares no better. In addition to the filed-rate doctrine bar (*see, supra*, Section III.B), these allegations also fail to include *any* facts regarding causation, transaction details, or the extent of alleged

P.3d 3, 99 (Or. 2015) ("ascertainable loss of money or property" caused by the unlawful trade practice required); **Pennsylvania**: *Jarzyna v. Home Props., L.P.*, 185 F. Supp. 3d 612, 626 (E.D. Pa. 2016), *aff'd*, 783 F. App'x 223 (3d Cir. 2019) (same as Or.); **South Carolina**: *Health Promotion Specialists, LLC v. S.C. Bd. of Dentistry*, 743 S.E.2d 808, 816 (S.C. 2013) (only private parties who have "suffer[ed] ascertainable loss of money or property" can bring private suit); **Utah**: *Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1242 (D. Utah 2018) ("only those who have been injured" entitled to damages).

overcharges. Plaintiffs do not plead what they paid, what they *should* have paid, or how any specific data was used to alter their premium.[26] These gaps render the overpayment theory a non-starter for alleging actual damages. *See Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010) (no actual damages where plaintiffs "agreed to pay a certain price for [a product], which they do not allege was defective or worth less than what they actually paid"); *Baron v. Pfizer*, 840 N.Y.S.2d 445, 448 (N.Y. App. Div. 2007) (must plead facts showing price "was inflated as a result of defendant's deception"); *Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 12–13 (1st Cir. 2017) (rejecting perceived-value theory of harm). Speculative or generalized price-premium theories, unmoored from facts or individualized reliance, do not establish actual harm. *See Johnson v. Jos. A. Bank Clothiers, Inc.*, No. 2:13-cv-756, 2014 WL 4129576, at *5–8 (S.D. Ohio Aug. 19, 2014) (no actual harm absent proof of overpayment tied to misrepresentation); *Haskins v. Symantec Corp.*, 654 F. App'x 338, 339 (9th Cir. 2016) (dismissing for failure to allege reliance on misstatements).

**3. All of the State Consumer Protection Statute Claims Sound in Fraud and Must be Dismissed for Failure to Satisfy Rule 9(b).**

Federal courts consistently apply Rule 9(b)'s pleading requirements to state law consumer protection claims that "sounds in fraud," i.e., those based on alleged deception, concealment, or misrepresentation. As the Ninth Circuit explained in *Vess v. Ciba-Geigy Corp. USA*, Rule 9(b) applies when a complaint "alleges a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim." 317 F.3d 1097, 1103–04 (9th Cir. 2003). Federal courts agree. *See Young v. Grand Canyon Univ., Inc.,* 57 F.4th 861, 875 (11th Cir. 2023) ("Rule 9(b) applies to an [Arizona Consumer Fraud Act] claim because such a claim sounds in fraud.");

[26] Importantly, establishing a damages model based on this theory of harm would entail highly individualized inquiries into actual driving behavior, the allegedly "inaccurate" driving behavior, the modeled hypothetical premium, and the actual charged premium. Of course, pleading such allegations would expose the impossibility of adjudicating these claims on a class-wide basis.

*O'Connor v. Ford Motor Co.*, 477 F. Supp. 3d 705, 718 (N.D. Ill. 2020) ("Where an [Illinois Consumer Fraud Act] claim rests on allegations of deceptive conduct, Rule 9(b) applies and the plaintiff must plead with particularity the circumstances constituting fraud."); *Redmond v. Upfield US Inc.*, No. 1:22-cv-06334, 2024 WL 4347113, at *2 (N.D. Ill. Sept. 30, 2024) (same).

Here, Rule 9(b) applies to all of Plaintiffs' state consumer protection claims, because those claims are premised on Defendants engaging in a knowing, deceptive scheme to induce Plaintiffs into unknowingly surrendering their personal data through third-party apps. (Counts 7, 8, 13, 15, 16, 18, 20–30, 33, 35–38). *See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008) ("[A] federal court sitting in diversity applies federal pleading requirements 'even when the claim pleaded arises under state rather than federal law.'") The Complaint repeatedly characterizes Defendants' conduct as fraudulent, calling it "covert," "unauthorized," and "deceptive" (*see*, *e.g.*, Compl. ¶¶ 445, 459–67), and accuses Defendants of intentionally concealing the presence and operation of SDKs in consumer-facing mobile apps. Such allegations unambiguously "sound in fraud" and therefore subject the state consumer protection statutes to heightened pleading under of Rule 9(b).[27]

Plaintiffs do not come close to meeting their burden. Despite accusing Defendants of a multiyear, covert consumer data harvesting operation, the Complaint does not allege with

[27] The various state consumer protection statues either explicitly incorporate a fraudulent intent-standard or have been construed by courts as subject to Rule 9(b) where deception is central to the claim: *See*, *e.g.*, **California (Count 13):** *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009); **Georgia (Count 16)**: *Friedlander v. HMS-PEP Prods., Inc.*, 485 S.E.2d 240, 241–242 (Ga. Ct. App. 1997); **Indiana (Count 20)**: *Walkowiak v. Bridgepoint Educ., Inc.*, No. 2:16-cv-438, 2017 WL 2418391, at *2 (N.D. Ind. 2017); **Michigan (Count 23)**: *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 665–66 (E.D. Mich. 2011); **New Jersey (Count 24)**: *Naporano Iron & Metal Co. v. Am. Crane Corp.*, 79 F. Supp. 2d 494, 511–12 (D.N.J. 1999); **North Carolina (Count 28)**; *Topshelf Mgmt. v. Campbell–Ewald Co.*, 117 F. Supp. 3d 722, 727-28 (M.D.N.C. 2015); **Texas (Count 36)**; *Fonseca v. Allstate Vehicle & Prop. Ins. Co.*, No. 7:20-cv-00358, 2020 WL 7497018, at *2, *5 (S.D. Tex. Dec. 21, 2020); **Washington (Count 38)**: *Nemykina v. Old Navy, LLC*, 461 F. Supp. 3d 1054, 1058–59 (W.D. Wash. 2020).

particularity any of the basic elements required by Rule 9(b): a single false or misleading statement made by any Defendant, any specific misrepresentation or omission, any date or location where the supposed deception occurred; or any individual involved. (To the contrary, as discussed, *supra,* Section II, Plaintiffs allege they were informed of the alleged disclosures.) In all events, this type of generalized pleading fails to provide the "who, what, when, where, and how" of the fraud as required by Rule 9(b). *See Topshelf*, 117 F. Supp. 3d at 725 (plaintiff must "describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation"); *Walkowiak,* 2017 WL 2418391, at *2 (same for IDCSA claim).

### D. Plaintiffs' Remaining Privacy Tort Claims or Counts Based on Inapplicable Statutes Should Be Dismissed (Counts 4–6, 10, 17, 31).

#### 1. Plaintiffs Cannot State a Claims for Invasion of Privacy or Intrusion on Seclusion Under Any Source of Law (Counts 4–6, 31).

Plaintiffs raise four other state law privacy claims: Illinois Invasion of Privacy (Count 4); Illinois Intrusion Upon Seclusion (Count 5); California Constitutional Invasion of Privacy (Count 10)[28]; and Pennsylvania Invasion of Privacy (Count 31). All four claims have two basic elements in common: the defendants' conduct must be highly offensive to a reasonable person, and that conduct must violate a plaintiff's reasonable expectation of privacy in the matter.[29]

---

[28] The California Right to Privacy (Count 13) also does not confer a private right of action for damages—it only allows for injunctive relief. *See Meyer v. Cnty. of San Diego*, 21-cv-341-RSH-BLM, 2025 WL 449747, at *26 (S.D. Cal. Feb. 10, 2025). To the extent Count 13 seeks damages, it must be dismissed.

[29] For the Pennsylvania invasion of privacy claim (**Count 31**), *see Coinja West v. Global Lending Servs., LLC*, No. 24-cv-726, 2025 WL 1534967, at *6 (E.D. Pa. May 28, 2025). For common law right to privacy and California constitutional invasion of privacy claims (**Counts 4 and 10**), *see Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1193 (N.D. Cal. 2020) (noting that, "[w]hen alleged together, the Court assesses the two claims together and examines the largely parallel elements of these two claims") (cleaned up), *subsequent determination*, 2021 WL 242884 (N.D. Cal. Jan. 25, 2021). For common law intrusion upon seclusion claims (**Count 5**), *see Pucillo v. Nat'l Credit Sys., Inc.*, 66 F.4th 634, 640 (7th Cir. 2023), *reh'g denied*, 2023 WL 4424615 (7th Cir. July 10, 2023) and *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 293 (3d Cir. 2016).

Both elements require the plaintiff to satisfy a contextual inquiry that looks to prevailing social norms. *See Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1073 (Cal. 2009). "The analysis of whether an invasion of privacy is 'highly offensive' must [] focus on the degree to which the invasion is 'unacceptable as a matter of public policy.'" *Cousin*, 681 F. Supp. 3d at 1127 (declining to find that disclosure of "names, emails, phone numbers, addresses, social security numbers, browsing histories, and user locations" "during routine browsing activity rise to the level of 'highly offensive'"). Likewise, a plaintiff's reasonable expectation of privacy depends on whether the matter is, or readily can become, publicly observed or disclosed. *See Troeckler*, 2015 WL 1042187, at *3 (declining to find expectation of privacy in automobile movements, where plaintiff "failed to plead how a passerby on the street or an individual in another vehicle could not capture the same information that the tracking device captured").

Here, Plaintiffs' remaining privacy claims fail to establish either of the two basic elements. As an initial matter, as detailed *supra*, Section I.A., Plaintiffs fail to plead any plausible basis that *any particular Plaintiff* had his or her data disclosed inappropriately. *Doe v. Amgen Inc.*, No. 2:23-cv-07448, 2024 WL 575248, at *3 (C.D. Cal. Jan. 29, 2024) (dismissing privacy claims where "allegations that the presence of the Meta Pixel on Defendant's website . . . resulted in the disclosure of her personal information, is generic and devoid of factual support").

Plaintiffs' few factual allegations are improperly based "upon information and belief" and do not specifically allege the SDKs *actually* disclosed to Defendants what Plaintiffs say they *might* disclose. *See*, *e.g.*, Compl. ¶¶ 21, 28, 30, 39, 48, 55, 58, 65, 67, 74, 76, 85, 92, 94, 167, 183, 185, 192, 195, 299, 315, 317, 326. These allegations do not amount to actual "highly offensive" conduct. *See Heeger*, 509 F. Supp. 3d at 1187–88 (dismissing complaint where"[f]ew facts are alleged without the caveat of 'on information or belief,' or without hedging on whether Facebook

actually does what Heeger accuses, or simply has the ability to do it."); *see also In re Trans Union Corp. Privacy Lit.*, 211 F.R.D. 328, 343–44 (N.D. Ill. 2002) (dismissing privacy claim where plaintiffs did not plead factual detail necessary to show actions were "highly offensive"). And in any event, disclosures of location data is not highly offensive. *See*, *e.g.*, *In re iPhone Application Litig.*, 844 F. Supp. 2d at 1063 (holding disclosure of unique device identifier numbers, personal data, and geolocation would "not constitute an egregious breach of social norms.").

Most fundamentally, Plaintiffs cannot plead an invasion of any reasonable expectation of privacy. A plaintiff "in an invasion of privacy case must have conducted himself or herself in a manner consistent with an actual expectation of privacy, i.e., he or she *must not have manifested by his or her conduct a voluntary consent* to the invasive actions of defendant." *Hill v. Nat'l Collegiate Athletic Assn.*, 865 P.2d 633, 648 (Cal. 1994) (emphasis added) ("The maxim of the law 'volenti non fit injuria' (no wrong is done to one who consents) applies as well to the invasion of privacy tort."). For the reasons described above, *supra,* Section II, Plaintiffs' consent to data addresses any reasonable expectation of privacy over that data, which further defeats Counts 4, 5, 10, and 31. *See* Restatement (Second) of Torts § 892A (1979) ("One who effectively consents to conduct of another intended to invade his interests cannot recover in an action of tort for the conduct or for harm resulting from it.").

**2. There Is No Private Right of Action Under the SHIELD Act.**

Plaintiffs cannot assert a claim under New York's SHIELD Act (N.Y. Gen. Bus. Law §§ 899-aa; 899-bb) (Count 27) because it does not provide a private right of action. *See In re USAA Data Sec. Litig.*, 621 F. Supp. 3d 454, 471 n.7 (S.D.N.Y. 2022) (the New York Shield Act does not "create[] or impl[y] a private right of action"). Accordingly, Count 27 must be dismissed.

### 3. Plaintiffs' Claims Under OCGA § 13–6–11 Must be Dismissed.

In Count 17, the Georgia Plaintiffs seek statutory attorney's fees and expenses of litigation pursuant to OCGA § 13–6–11. "A prerequisite to any award of attorney fees under O.C.G.A. § 13–6–11 is the award of damages or other relief on the underlying claim." *United Cos. Lending Corp. v. Peacock*, 475 S.E.2d 601, 602 (Ga. 1996). To the extent the Court dismisses all claims asserted by the Georgia Plaintiffs, it also should dismiss Count 17. *Dantzler, Inc. v. Hubert Moore Lumber Co*., No. 7:13-cv-56, 2013 WL 5372750, at *3 (M.D. Ga. Sept. 24, 2013).

## VII. Plaintiffs' Claims against AllCorp, AIC, AVPIC, Arity 875 and Arity Services Should Be Dismissed.

If a complaint fails to "clearly indicate which defendants are liable under which counts, it must be dismissed for failure to comply with Fed. R. Civ. P. 8." *Huyck v. Milwaukee Area Technical College*, No. 1:21-cv-1448, 2022 WL 1048862 at *1 (E.D. Wis. Apr. 6, 2022) (citing *Davis v. Anderson*, 718 F. App'x 420, 424 (7th Cir. 2017)); *see also Nagel v. ADM Investor Servs., Inc.*, 995 F. Supp. 837, 845 (C.D. Ill. 1998) (ordering plaintiffs to replead because "the pleading style adopted . . . makes it virtually impossible to ascertain which defendants are responsible for which allegedly wrongful acts or to determine whether the plaintiffs have stated a cause of action against various defendants").

Other than Count III, which alleges violation of the FCRA by the Arity Defendants, *see* Compl. ¶ 515, Plaintiffs bring *all* counts against *all* defendants without explaining which factual allegations apply to which counts and which defendant. Other than to name them as defendants, Plaintiffs plead no facts showing any conduct by AVPIC, Arity 875, nor Arity Services, let alone how liability attaches to each of them. This amounts to improper group pleading requiring dismissal. *See P & P Mktg. Inc. v. Ditton*, 746 F. Supp. 1354, 1362 (N.D. Ill. 1990) ("Where there

are multiple defendants, the complaint must inform each defendant of the specific act allegedly committed by the defendant justifying his inclusion in a particular count.")

Separately, there are additional factors unique to AllCorp, AIC, and AVPIC that warrant their dismissal from this action. First, Plaintiffs incorrectly plead that AllCorp "provides insurance products, including car insurance, throughout the United States." Compl. ¶ 377. As other courts have recognized, AllCorp is a non-operating holding company that does not even have authority to issue, write, or sell insurance products. *See Shannon v. Allstate Corp.*, No. 1:20-CV-448-LY, 2021 WL 8083333, at *1, *5 (W.D. Tex. May 24, 2021), *report and recommendation adopted*, No. 1:20-cv-448-LY, 2021 WL 8083341 (W.D. Tex. Aug. 6, 2021) (dismissing AllCorp and holding it is "itself not an insurance company" but instead a "non-operating holding company with no employees").

Second, plaintiffs do not allege that certain defendants even *operate* in some of the states in which Plaintiffs allege they were harmed. For example, Plaintiffs allege that AIC and AVPIC "provide[] insurance products, including car insurance, throughout the United States." Compl. ¶¶ 78–79. But Plaintiffs do not allege in which states AIC or AVPIC sell auto insurance, much less where such policies might be impacted by telematics data. So, as one example, the Texas Plaintiffs do not (and cannot) allege that they were harmed by AIC and AVPIC because their insurance rates increased. As a matter of pleading, Plaintiffs should not be permitted to move forward with expensive and burdensome litigation with overbroad allegations like "throughout the United States" without taking the time to see—and actually allege consistent with their Rule 11 obligations—which Defendants operate where.

For the reasons detailed above, this court must dismiss all claims as to AllCorp, Arity 875, AIC, AVPIC, and Arity Services.

## CONCLUSION

For the foregoing reasons, Plaintiffs' claims should be dismissed.

Dated: July 10, 2025

Respectfully submitted,

*<u>/s/ David A. Gordon</u>*
David A. Gordon
H. Javier Kordi
Liamarie M. Quinde
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
dgordon@sidley.com

Ian M. Ross
SIDLEY AUSTIN LLP
1001 Brickell Bay Drive, Ste. 900
Miami, FL 33131
Telephone: (305) 391-5100
Facsimile: (305) 391-5101

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on July 10, 2025, the foregoing *Defendants' Memorandum of Law ISO Motion to Dismiss the Consolidated Complaint* and accompanying *Exhibits A* and *B* to the same were filed electronically using the ECF system, which will send notification of such filing to all counsel of record at their e-mail addresses on file with the Court.

s/ *David A. Gordon*

David A. Gordon
One of the Attorneys for Defendants